Jessie **STEVENSON** et al., Plaintiffs,

v.

**INTERNATIONAL PAPER COMPANY, MOBILE, ALABAMA, et al.,** Defendants.

Civ. A. No. 6647–71–H.

United States District Court, S. D. Alabama, S. D.

Dec. 7, 1972.

lief in the state courts identical to that sought in this Court.

Algernon J. Cooper, Frankie Fields Smith, Vernon Z. Crawford, Mobile, Ala., Jack Greenberg, James M. Nabritt, III, William L. Robinson, Lowell Johnston, Sylvia Drew, New York City, for plaintiffs.

R. F. Adams, Brock B. Gordon, Mobile, Ala., Benjamin Erdreich, Birmingham, Ala., for defendants.

OPINION OF THE COURT
PRELUSIVE COMMENT

HAND, District Judge.

This action was filed in this Court on May 10, 1971, by plaintiffs on their behalf as individuals and on behalf of those similarly circumstanced, against the International Paper Company and the International Brotherhood of Pulp, Sulphite and Papermill Workers, AFL-CIO, their Locals 229 and 337, and Locals 265–A, 265 and 940 of the United Papermakers and Paperworkers, Mobile, Alabama, claiming jurisdiction pursuant to the provisions of 28 U.S.C., Section 1343(4), 42 U.S.C., Section 2000e–5(e)(f) and 28 U.S.C., Sections 2201 and 2202, requesting among other things, injunctive relief as provided in 29 U.S.C., Section 151 et seq. It is contended that this is a class action and that the plaintiffs represent black persons employed or who might seek employment at the manufacturing facility of International Paper Company in Mobile. The claim is also predicated on representation of the alleged class by the

black members of the local unions who have or might continue to be adversely affected by the practices of which complaint is made.

The nature of the claim is for declaratory relief with permanent injunction requested, restraining all of the defendants from continuing policies and practices discriminating against the plaintiffs and practices discriminating against the plaintiffs and other blacks with respect to hiring, compensation, terms and conditions of employment; limiting, segregating and classifying employees in ways that denied the members of the class their equal employment and otherwise adversely affecting their status as employees or prospective employees; refusing to promote, because of race; demoting, because of race; merging formerly segregated unions without provision for protection of the formerly all black members of these unions; and by harassing members of the class because of their race.

At the time of the filing of this action there was pending in this Court two other cases filed by the same law firms [1] on behalf of named parties plaintiff, including some of the named parties plaintiff in this case, who sued individually and on behalf of others similarly circumstanced. These cases were styled Herron et al. v. United Papermakers and Paperworkers, AFL-CIO, et al., Civil Action No. 5665–69–P (S.D.Ala.) and Fluker et al. v. Locals 265 and 940, United Papermakers and Paperworkers, AFL-CIO, et al., Civil Action No. 5839–70–P (S.D.Ala.) and were filed on September 15, 1969, and January 13, 1970, respectively. The Herron case averred jurisdiction pursuant to the provisions of 28 U.S.C., Section 1343, 42 U.S.C., Section 2000e–5(f), 28 U.S.C., Sections 2201 and 2202, and 29 U.S.C., Sections 411(a)(1) and 412. The Fluker case averred that

the action was to redress the deprivation of rights secured by 42 U.S.C., Section 1981, 29 U.S.C., Section 151 as well as 29 U.S.C., Section 411. Jurisdiction was invoked pursuant to 28 U.S.C., Section 1343(4), 29 U.S.C., Section 412 and 28 U.S.C., Sections 2201 and 2202.

In both of the latter cases it was averred that the actions constituted class actions on behalf of the black employees of Local 406 of the Papermakers union which had been merged into the white local, who had been denied the same protection and benefits of union membership as enjoyed by whites and who had been discriminated against on the basis of race; their right to make and enforce contracts; their right to be fairly represented by the unions; and their right to participate in elections and deliberations of the union. Further, relief was sought to re-establish Local 406 as an all segregated black union until such time as protective transitional arrangements could be made.

These two cases proceeded to trial prior to this case and an opinion and order was entered by Judge Pittman on the 9th day of December, 1971. In connection with the trial of the Herron and Fluker cases, the parties entered into a joint pretrial agreement. Among things stated as being contested in that action was the issue of whether or not the union properly represented the parties in grievance procedures and whether any of the parties complained about the manner of job or employment opportunities. Also contested was whether or not there was any unlawful racial discrimination between papermakers and the company in regard to black employees under their jurisdiction and in the application of the terms of the union-management contract.

The Court took judicial notice of these cases including all pleadings, exhibits,

---

1. The complaints in *Herron-Fluker* were filed by attorneys Frankie L. Fields and Vernon Z. Crawford of Mobile, Jack Greenberg, William L. Robinson and Lowell Johnston and others of New York. Each of these same attorneys, and others, filed the original complaint herein. Mr. Blacksher and Mr. Baller who handled the trial of this case, but not *Herron-Fluker*, are associated with the same Mobile and New York lawyers, respectively.

transcript of evidence, arguments of counsel, pre and post-trial briefs, pre-trial order and agreement, and all other matters reflected in the court file.

There are and were a number of areas of overlap existing in the case at hand and the *Herron* and *Fluker* cases and a wide variety of things argued by counsel in the *Herron* and *Fluker* cases were advanced during the course of the trial of this case. Some of the same testimony was introduced and a number of the same arguments were made.

At the very commencement of the trial and in regard to the effect of the *Herron* and *Fluker* cases on the issues of res judicata and collateral estoppel, the parties agreed that the case of Wasoff v. American Automobile Insurance Company, 451 F.2d 767 (5th Cir.1971) was controlling and that the *Herron* and *Fluker* cases were determinative of all matters contested and all matters which could have been contested in those proceedings.

Though raised by the pleadings in this case, and often alluded to in pre and post-trial briefs and arguments, it was agreed that though historically the plant in Mobile had been segregated in the past this was not a material issue involved in this trial, save only insofar as it might reflect continuing results of that past condition. Historically, in the main, most industries in the South, and indeed in other areas of the country have past histories of racial segregation, for until recent date this had been the accepted norm. Regardless of what constituted the compelling reason for the industry to change this pattern of practice and notwithstanding the understandable advocacy of counsel for the plaintiffs in arguing and presenting this aspect of the case, the Court was greatly impressed by the candor and demeanor of the personnel of International Paper Company who testified in regard to their desire and zeal to comply with the present law and even more so, the improvement of race relations at its mill, both from a sociological standpoint and from an appreciation of the business advantages to be gained from the expanding of a qualified labor source.[2]

The Court is not to be understood to say that evidence in this case did not reflect occasional individual instances of discrimination, nor that there may not be such future occurrences at this plant, from both the white and black side, but it is to be understood to say that such evidence reflected that these proven instances were on an individual basis, not a company or union instigated basis. After all, we are dealing with human beings and every human being has his share of biases and prejudices and we have not yet reached the millenium. This is also not to say, though, that there was evidence that such individual acts were encouraged or condoned by management or by the labor unions, for the evidence clearly reflects the contrary, and in all instances brought to the attention of the Court through the testimony, strenuous efforts were advanced by management to correct or eradicate them.

This brings to mind another point reflected by the evidence which the Court feels is noteworthy of comment at this point.

The grievance procedures provided by Section VII of the contract with the union were shown to be operable and effective. Indeed, it was so held in *Herron* and *Fluker*. However, the testimony demonstrated that members of the class continuously circumvented these procedures in that, on an individu-

2. In this connection it should be noted that figures on new hires at the Mobile Mill demonstrate that between 1968 and 1972 24.4% of all hires were black and between 1970 and 1972 blacks constituted 30.4% of all new hires. These figures on their face compare favorably with the black population percentage of 30.3% in the Mobile area, thereby indicating that the company's testing practices do not serve as a barrier to minorities in their efforts to obtain employment at the International Paper Company Mill in Mobile, Alabama.

al basis, aggrieved members would contact non-union officials in their own unions, union officials in other unions, and higher authorities within the company, stating their alleged grievances and thereby by-passing foremen, shop stewards and the contract requirements itself. Apparently the company and the unions have permitted this out of an overabundance of caution in order not to be accused of discrimination. Where procedures for redress are available, and have been shown to have been effectively utilized, they should be followed. The law and case decisions which require employees and unions to operate on a non-discriminating basis are so numerous this can no longer be a disputed issue. All members of this class are adults. They have been told of, and the evidence shows they know, their rights. Once told and given opportunity to exercise them through the grievance machinery there is no requirement in law that they need be pampered. Such leads to both dissention and disrespect, and, possibly, by operation of such paternalism, to a discriminatory practice that would be illegal. Such practice should be brought to an end.

Another area for comment is also in regard to the fair employment practices resulting from the existence of the contract in question.

■ Where there is a company-union relationship resulting in a contract covering employee relations, and both the contract and its application by the parties is non-discriminatory, there is no area in which relief by the Court is indicated. This is so even though the contract, in its application to the efficient operation of the mill, results in great inefficiency, for it is not incumbent upon this Court to substitute its judgment for that of management or labor in striking a bargain arrived at through the collective bargaining process. In the instant case there are areas observed by the Court from a personal view of the operation of the mill, and from listening to all of the evidence,[3] that would indicate that some greater efficiency could be obtained by the elimination of some of the jobs and in the reduction of the work force which now approximates 1800 employees. The evidence demonstrates that this mill is operating at a profit even with the observed inefficiencies, and should the Court attempt to interfere by substituting its judgment for that of management, and be wrong in its conclusion, it conceivably could result in the loss of these 1800 odd jobs to the local economy with disasterous side effects.[4]

3. Plaintiffs' attorneys vigorously attacked the lines of progression as now structured in the Mobile Mill, but their only testimony in support of their position was that of the witness Rigassio, who admitted that his only experience in or knowledge of a continuous-process paper mill was at trip through the Mobile Mill, which he stated took approximately four hours, an average of less than twenty minutes in each of thirteen departments, and a similar trip through the Pine Bluff Mill of IP, which he stated was similar to but more modern than the Mobile Mill, and which covered a period of from 2½ to 4 hours. He suggested certain changes in the lines of progression as they are organized at the Mobile Mill, but further testified that there are many ways in which lines of progression may be fashioned, and that his suggestions were only proposed changes which might make the lines more functional.

For defendant IP, witness Williamson, who had been assistant manager at the Mobile Mill, mill manager at Pine Bluff and at Camden, and who is now the manager of all mill managers in the Southern Kraft Division of IP, testified that the lines of progression have developed through trial and error and labor-management negotiations over a period of many years and have proven by experience to be both functional and efficient. The testimony showed that Mr. Williamson is a graduate engineer with about 21 years practical business experience in the design, construction and operation of paper mills.

4. IP has a substantial investment in this plant. Replacement cost for the entire mill facilities, exclusive of land, are estimated to be $200,000,000.00. The cost of installing a boiler now under construction is approximately $7,000,000.00; the cost of one of the six paper machines, including its accessory equipment, was estimated to be $25,000,000.00 to $30,000,000.00.

If the contract itself was discriminatory by its terms, of course the Court would be authorized to fashion relief. If the contract was non-discriminatory, but its application was discriminatory, then the Court would be authorized to fashion relief. If, as contended by the plaintiffs, past applications carry over present discriminatory results, the Court would be authorized to fashion relief. This Court considers that the *Herron* and *Fluker* cases decided the issue of whether the contract was discriminatory and whether the application of the contract to the working conditions was discriminatory, concluding that it was not. Be this as it may, testimony was received on this point, considered by the Court, and will be commented upon, sub judice.

The parties conducted pre-trial discovery for the better part of one year. Trial commenced on September 5, 1972 and was concluded on September 13, 1972 with the Court hearing approximately seventy (70) hours of testimony and receiving volumes of exhibits. In addition, as indicated, the Court conducted a personal inspection of the facilities during the course of the trial for the purposes of better understanding the lines of progression, the conditions under which the persons involved performed their functions as employees; and for the further purpose of obtaining a better understanding of the complexity of the operation and the degree of skills necessary to provide for proper maintenance, both from the standpoint of production and of safety of its employees.[5] The Court considers this latter important for it is not unmindful of other requirements of the federal law in regard to employment practices including the requirements of the Occupational Safety and Health Act, Public Law 91–596 as found in 29 U.S.C., Section 651 et seq.[6]

5. IP operates a plant in Mobile, Alabama, which manufactures paper and paper products from raw wood. The facilities utilize a continuous process type of operation; that is, once the raw material is committed to the manufacturing process it remains in a steady and continuous stream through the various stages of manufacture from one process to the next until it emerges as a finished product. Under normal circumstances the Mill operates twenty-four hours a day, seven days a week with scheduled shutdowns occurring only for Independence Day, Labor Day and Christmas holidays.

In order to operate a capital intensive plant such as the Mobile Mill at a profitable level it is necessary for the plant to run at an extremely high level of efficiency; that is, paper must be coming off the machines and ready for shipment the maximum of time. Because of the continuous nature of the manufacturing process, an interruption anywhere along the production line could result in the shutdown of the entire plant.

The production and maintenance employees at IP are generally supervised and work on a departmental basis. Most of the production departments have a more or less fixed geographic location and the other departments perform essential services throughout the mill.

Within the production departments the work force is further broken down into lines of progression for training and promotion purposes. In the main, the lines of progression are structured so that jobs within a line are functionally related to each other and to the department which they serve. Entry into a line of progression is made at the lowest level in the line and promotions are made one step at a time, job by job. Entry into the lines may be by transfer between departments or from the labor pool serving the line. Before the effective date of the Jackson Memorandum, job seniority was acquired within the departmental framework. Upon transfer to another department or line of progression, the transferee would begin anew to accumulate seniority for promotion purposes.

6. The Court finds that the lines of progression are functional and provide for training and acquisition of necessary experience which enable employees to perform their jobs safely and efficiently as they move up the progression ladder job by job. Plaintiffs have complained of the requirements that employees begin at the bottom job in the line of progression and promote job by job, but the Court finds that the evidence shows that with each advance the jobs affected thereby tend to become more complex and place demand for greater operational skills on the employees who fill those jobs. The more knowledge an employee has of the other jobs affected

## PLEADINGS

1. As indicated, supra, the complaint is a broad based allegation which challenges in all respects the employment practices of IP as concurred in by defendant unions. Specifically, the complaint charges the defendants with discrimination because of race with respect to hiring, compensation, terms, conditions and privileges of employment; limiting, segregating and classifying black employees in ways which deprive them of equal employment opportunities; refusing to promote, and demoting because of race; harassment; and merging formerly segregated unions without provisional protection for blacks.

The defendants have filed separate answers but have raised some common grounds of defense. All the defendants have filed a general denial of the material allegations of the complaint, have said that the plaintiffs failed to comply with the statutory prerequisites to the institution of this suit, and have raised the defense of res judicata and collateral estoppel. In addition, IP and Pulp Workers raised laches and the statute of limitations as an additional defense. IP further defends on the grounds that plaintiffs seek relief not authorized by the Federal Acts sued upon and that the plaintiffs are estopped to deny the actions of their lawfully constituted bargaining agents in agreeing to some of the practices challenged by plaintiffs. Pulp Workers also defend on the grounds that the mergers objected to are one of the principal objectives of the 1964 Civil Rights Act, and that any complaints plaintiffs have in regard to the duty of fair representation fall within the exclusive jurisdiction of the National Labor Relations Board.

Prior to trial, and after conclusion of comprehensive pretrial discovery, the parties identified sixteen (16) specific points as being the triable issues, and further agreed that any issue which could be raised but which was not specified would be deemed not in dispute and barred from further litigation by the decree to be rendered herein.

Summarizing these triable issues, they involve whether the 1968 Jackson Memorandum of Understanding as amended by the 1972 Jackson Memorandum adequately meets the requirements or objectives of the law and whether the proper implementation of these memoranda of agreement was determined by the Court in the *Herron* and *Fluker* cases; whether the institution of testing practices was intended to further past segregation or assisting in the determination of qualifications of employees on a job related basis; and whether the plaintiffs are entitled to affirmative measures of relief, including the award of back pay. As to the issue of back pay, this was reserved for later consideration depending on the conclusion and opinion of the Court resulting from the instant trial.[7]

## FINDINGS OF FACT

1. This Court has jurisdiction of this case pursuant to 28 U.S.C., Section 1343(4); 42 U.S.C., Section 2000e(f) and 28 U.S.C., Sections 2201 and 2202. Defendants are charged with violating (a) Title VII of the Civil Rights Act of 1964, 42 U.S.C., Section 2000e et seq., (b) 42 U.S.C., Section 1981, providing for the equal rights of all persons in every state and territory within the jurisdiction of the United States; and (c) the duty of fair representation, 29 U.S.C., Section 151 et seq.

2. International Paper Company is an employer in an industry affecting interstate commerce within the meaning of Section 706(b) of the Civil Rights

---

by or having an effect on his immediate task, then the more efficient he may be in the performance of his own duties and the more aware he will be of how job functions he performs affect the efficiency and safety of employees in lower jobs in the line of progression. This benefit is of particular importance in a continuous process production system.

7. The seventeen (17) points are more fully set forth and are to be found in the pretrial order filed August 17, 1972.

Act of 1964, 42 U.S.C., Section 2000e–5(b).

3. The defendant labor unions are organizations engaged in an industry affecting commerce within the meaning of Section 701(d)(e) of the Civil Rights Act of 1964, 42 U.S.C., Section 2000e(d)(e).

4. Plaintiffs have complied with the procedural requirements of Sections 706(a), (d) and (e) of the Civil Rights Act of 1964, 42 U.S.C., Section 2000e–5(a)(d)(e).

5. This action was initiated as a class action pursuant to Federal Rules of Civil Procedure 23(c). Notice was given to the following defined class: [8]

"Those black employees of International Paper Company at its Mobile, Alabama mill employed at the commencement of this cause; those black employees employed and still employed since the commencement of this cause and all future employees of International Paper Company at its Mobile, Alabama mill, (excluding all job applicants) who are members or eligible to be members of International Brotherhood of Pulp, Sulphite and Paper Mill Workers; and Local 265–A, 265 and 940, United Papermakers and Paperworkers, Mobile, Alabama."

## THE HERRON-FLUKER CASES

6. Prior to the trial, the defendants filed separate motions for summary judgment, claiming that the decision in *Herron-Fluker*, supra, barred relitigation of the issues raised here under the equitable principles of res judicata, collateral estoppel, bar and privy. The Court took those motions under advisement prior to hearing the evidence at trial, reserving ruling thereon.

The entire transcript of record in those cases, as well as all of the pleadings, briefs and other papers were judicially noticed by this Court in the present proceeding. Those cases, tried as one consolidated action, touched on almost every aspect of the employment scheme at IP, although IP was not a party defendant, nor were the Sulphite Workers.

The transcript, as well as other papers, is replete with suggestions by plaintiffs' counsel, that the Jackson Memorandum sufficiently modified the bargaining agreement to provide blacks with the opportunity to reach their rightful place in the seniority system. Indeed, if the issue was not raised, it could have been, since the actions were, as Judge Pittman noted, attacks on the allegedly discriminatory promotion practices at International Paper Company's Mobile Mill. Subsequent review of such matters which might properly have been tried in the earlier action are precluded under this Circuit's rule in *Wasoff*, supra.

Plaintiffs argue that only limited issues were raised in *Herron-Fluker*, namely those involving the union merger, discussed above, and the interpretation of a controversial 30-day clause in the collective bargaining agreement. Plaintiffs agree that those issues are settled, but insist that Judge Pittman was not asked to determine the validity, vel non, of the Jackson Memorandum, the company's testing program, or issues relating to the demotion and harassment of black employees. The record is not in accord.[9]

---

8. Subsequent to the filing of this case, almost on the eve of trial, the Sulphite Workers and the Papermakers merged into a single entity known as the United Paperworkers International Union, AFL–CIO ("Paperworkers"), which was substituted as the proper union defendant. However, for clarity, and because the bargaining history and factual development reflects separate transactions by each of the former international unions, they will be referred to herein by their former designations, "Sulphite Workers" and "Papermakers". The local unions have their numerical identity.

9. In the opening statement at the trial of the *Herron-Fluker* cases, after outlining the issue relating to merger of the local unions, counsel for defendant Papermakers remarked:

Now, the second issue, that was injected in the case, at the pre-trial, in March

of this year, when (sic) to the issue of employment opportunities. And this goes back to the Jackson Memorandum. And this point is also in the brief, that the criteria or what Fifth Circuit requires when you had former black and white lines of progression, the Jackson Memorandum, we submit, follows those guidelines. In other words, the Court said that you could still maintain lines of progression. And the Jackson Memorandum allows for that to continue that plant seniority will be used to determine the promotion of competing white and black employees. And the Jackson Memorandum does that. And moreover, the Jackson Memorandum, as we pointed out, was agreed to by this plaintiff class, as well as the line of progression that resulted when those lines were merged . . . . (Transcript, 155–156).

In response, counsel for the plaintiff class made these observations:

The other things is that the proof the former (sic) proof that we rely on in this case, which has never been brought out clearly by the defendants, is first, the plaintiffs in this case are entitled to the relief we have requested because of the background of discrimination of the company. Secondly, because, in the face of the Jackson Agreement, the defendants have continued to discriminate against the black employees. And so, on these two trogs (sic. grounds?), that we believe we are entitled to relief. We believe either one is sufficient. But we believe both support our case. (Transcript, 157).

Further on, the same New York Counsel for plaintiff class engaged in the following colloquy with the Court in regard to the Jackson Memorandum.

THE COURT:

. . . opinion that it doesn't go far enough.

MR. JOHNSTON:

I'm not saying that. I'm saying that the Jackson Agreement is what it says it is. And that subsequent practice under the agreement by the company and unions have defeated the purpose of the Jackson Agreement.

THE COURT:

All right, you may go ahead.

MR. JOHNSTON:

I would like to add one more thing. I think the Jackson Agreement, as we say, has been supported in the case law, U. S. v. Local 189, 416 F.2d 980, Fifth Circuit, I think the Jackson Agreement is the local 189 principal being applied

here at this company—those being implemented not by the Court but by the O.F.C.C. (Transcript, 268).

The same counsel for plaintiffs further elucidated upon their theory of the case at pages 279–281 of the transcript:

THE COURT:

Before you leave the stand, Mr. Johnston, I think I need to clarify just what your contention is. As I understood this witness to testify, that you considered, after the merger, his in jeopardy because he was competing with white seniority. Now, since this Jackson Memorandum has been explained to me, what is your contention with job jeopardy.

MR. JOHNSTON:

Well, my position generally is, first, that given the background and experiences of Local 406 and the history and practices of the company (sic), the charter of Local 406 should not have been revoked. There should have been a union merger which we have described, your Honor, in our brief and referred to in testimony. Secondly, we're saying because the Jackson Agreement has not been implemented properly . . .

THE COURT:

Now, that's what I'm getting at. What's the failure of implementation. He says he was competing with job seniority. Assuming that the Jackson Memorandum—and I'm not asking you to—but assuming the Jackson Memorandum takes care in a practical way against discrimination, where is the job jeopardy? What facts do you base job jeopardy on?

MR. JOHNSTON:

If it could be shown that the Jackson Agreement was being properly implemented . . .

THE COURT:

That's what I'm talking about. Where is the failure of implementation? And I'm giving you the opportunity of this witness while he's on the stand—his experience, if there's been any.

MR. JOHNSTON:

I think the rest of our witnesses— other witnesses—their own personal experiences.

THE COURT:

All right.

MR. COLE:

Just a couple of questions, please.

MR. JOHNSTON:

I think Mr. Herron has also testified of his own personal experience as to how his job has been in jeopardy—how he has not been given fair representation by the union for equal job opportunities by the company and the union.

The Court has serious doubts whether it can or should, as plaintiffs insist, again consider some, if not most, of the issues raised in the present litigation because of the opinion in *Herron-Fluker*. However, despite such misgivings, and wishing to resolve this matter in such a way as to prevent any of the parties undue delay which might be occasioned by granting the motions *en toto*, the Court will consider the merits of the plaintiffs' claims involving seniority, promotions, the Jackson Memoranda, and all issues relating to the testing program. The motions for summary judgment will, therefore, be dealt with subsequently.

## HISTORICAL BACKGROUND

7. Defendant, International Paper Company, a manufacturer of sundry paper products, began operations in Mobile in the 1920's. As the majority of companies that located in the South did, the mill was predominately segregated.

The first major change in management-labor relationship occurred in 1939 when the company voluntarily recognized the unions, and began to negotiate with each union individually. In each contract there was incorporated the informal lines of progressions, jobs within, and job classifications that were previously in existence.

This relationship continued until 1951 when, as a result of a National Labor Relations Board election, the unions were certified as a "joint group" to bargain as a single representative. The unions kept their identity with reference to membership, representation and work jurisdiction.

Historically, the company continued to operate on a segregated basis until 1962. That year, the company, with the full cooperation of the unions, abandoned its prior policy; they fully desegregated the personal facilities and opened all lines of progression to everyone. Although no affirmative action was taken to encourage blacks to move, this was still a major step at the time this action was taken. The personal facilities were desegregated without any major incident. However, since there were separate lines of progressions in effect for blacks and whites prior to this time, the opening of the lines of progression to all, without regard to race, etc., was still more in theory than practice, as members of each race voluntarily continued to migrate to those jobs in which their race was in the majority.

The International Brotherhood of Pulp, Sulphite and Paper Mill Workers accomplished the next step in an effort to eliminate racial discrimination when in May, 1966, within their work jurisdiction, the union merged their locals and merged the lines of progression under their jurisdiction, thus having in one line of progression those jobs in which the blacks formerly were in the majority and those jobs in which the whites formerly were in the majority. The jobs that the majority of blacks were performing were menial type jobs, paid at a rate less than the more complicated, higher paid jobs the whites were performing. From an industrial view this may have been correct, but, unfortunately the blacks were locked in their jobs and protective measures were not installed to insure they would reach their proper place within the new line of progression, allowing for future vacancies, safety, health, seniority, and qualifications.

In 1968, black employees complained to the Office of Federal Contract Compliance (OFCC). After investigation, the company was notified they were in violation of Presidential Executive Order 11246, and presented with a 12 point proposal that the company must implement in order to meet compliance requirements. Members of the class, the

THE COURT:
I suppose you mean the lack of training?

MR. JOHNSTON:
Harassment and the fact that he didn't obtain permanent promotion.

company, unions and OFCC met in August of 1968, at Jackson, Mississippi and reached an agreement (Jackson Memorandum of Understanding) which was designed to bring the company into compliance. The Office of Federal Contract Compliance did not insist on the adoption of all of the 12 points previously advanced and did subsequently approve the agreement reached. The parties signatory to that agreement include at least one of the named parties plaintiff who was or had been a union official in former Local 406 of the Papermakers union. As more fully appears later, additional adjustments were made and are now included in the 1972 amendment to the Jackson Memorandum.

## JACKSON MEMORANDUM

8. The Office of Federal Contract Compliance during its investigation in 1967–68 did not find any discrimination in filling craft vacancies. They did find that certain black employees in production were not in their proper place as a result of past discrimination. These black employees, a total of 324, were defined as "affected class" in the Jackson Memorandum of Understanding of 1968 as follows:

(a) Negroes employed prior to September 1, 1962, and (b) Negroes employed since September 1, 1962 but initially placed in a job or a line of progression formerly considered as an all Negro job or line of progression.

10. The primary impact of the Jackson Memorandum was to identify an "affected class" of employees (sometimes referred to as AC) and to displace the old job seniority system with a mill seniority system whereby members of the affected class compete with other employees for promotion, demotion, recall, transfer and other personnel actions on the basis of mill seniority. If competition does not exist, the Jackson Memorandum provides that the traditional contract seniority applies. Members of the affected class are defined as those black employees hired prior to September 1, 1962, or employed thereafter, but prior to the date of the Jackson Memorandum, and initially placed

The Jackson Memorandum provided three major changes:

(a) Merging Progression Lines. Agreement to be reached within 90 days following ratification of this memorandum.

(b) Within 30 days after the lines of progression have been merged, the appropriate representative of the local unions and the company would meet to determine the shortening of lines of progression and determining those jobs, if any, which might be skipped in advancing within or transferring between lines of progression.

(c) Affected class usage of Mill (plant) seniority to reach proper place.

By way of compliance, the evidence shows that the merging of the lines of progression was completed and is a settled issue; the union and company attempted to reach an agreement for job skipping but were not successful; and, the company and unions did adopt and are now living in accordance with the seniority changes of the agreement.[10]

Plaintiffs are accepting the benefits of the memorandum but are contesting that the company and unions (a) did not notify affected class of the agreement, (b) failed to promote within the terms of the memorandum, (c) discriminated in training and in making temporary promotions, (d) parts of the agreement were inadequate as a matter of law; and, (e) the memorandum is not effective to alleviate past discrimination of the affected class.

in a job or line of progression which was formerly a predominately black job or line.

The Jackson Memorandum further provides that all current employees are eligible for transfer or advancement into a line of progression if they are as qualified as the minimally qualified employee currently working in that line. Testing was deleted as a requirement for incumbent employees to be eligible for transfer or to entry into any production line of progression. It further provided for affected class transfer under a "red-circle" rate which protected against wage loss in the event the desired transfer was to a lower paying job.

The evidence shows as to each point as follows:

(a) Plaintiffs alleged and testified they were not notified of the agreement by the company, but they did learn of the agreement and terms within at union meetings. The company rebutted this by documentation of the dates plaintiffs were notified and the results of the interviews. There is no doubt plaintiffs knew of the agreement, as they had representatives at the Jackson Conference, attended union meetings where the agreement was discussed and were notified by the company.[11]

(b) In *Herron-Fluker,* supra, the Court found that the contract was modified by the Jackson Memorandum and company and unions were abiding by the amended contract. This is further confirmed by this decision.

(c) Plaintiffs contended that when training is done by white employees, they were and are being disqualified for advancement, but when training is done by black employees for these same jobs, they were and are shortly thereafter certified as competent. However, plaintiffs also admit that the black employees who were and are now used to train them were themselves trained by the same white employees who it is now claimed gave them improper training. This of course, is illogical. As *Herron-Fluker* held, the affected class is being trained for job promotion. In a majority of instances as shown by the testimony in this case, such training was conducted for a period of two weeks for blacks while whites were required to qualify in only one week for a job. Indeed one of the plaintiffs testified that he personally received training for a period of 22–26 weeks on one job.[12] This was an effort by the company to qualify him for this job. There is no discrimination in the training process reflected by the testimony here, or in the *Herron-Fluker* transcript.

As to the filing of temporary vacancies, the record clearly reflects there is no substantial difference in the number of blacks receiving temporary promotions as compared to white, a fact admitted by plaintiffs' expert witness testimony.[13]

---

11. Shortly after adoption of the Jackson Memorandum in August, 1968, the personnel department of the Mobile Mill of IP interviewed affected class employees to advise them of their rights and to determine their interest in transferring from the line in which they were then working to another line of progression, and for those not in a line of progression to determine those lines of progression into which they desired to promote. Written applications were prepared for AC's who desired to transfer or promote and these were retained in the personnel office for future reference as vacancies occurred. These applications remained active without additional action by the AC for future vacancies. This is in contrast to application and transfer by NAC's where under the terms of the Labor Agreement their applications remain active for a limited period of 90 days unless they are renewed by the employee. AC's who initially said they were not interested in transferring or moving up were subsequently contacted again to specifically determine if they desired to then exercise their rights under the Jackson Memorandum. Also, the company agreed to post for seven days notices, throughout the plant of all permanent vacancies in entry level jobs as well as for temporary vacancies which were expected to last more than thirty days. Copies of these notices were also sent to each of the local unions. All employees could apply for any vacancy thus posted and competition between those applicants, employees who had previously expressed a desire for that line of progression, and employees in the labor pool serving that line of progression was resolved on the basis of mill seniority in accordance with the terms of the Jackson Memorandum.

12. The witness James Gibson admitted that he was given 22 weeks training on a job before being told he was incapable of handling the job, then, after he filed a grievance, the company gave him four additional weeks training in a job which, the testimony was, normally called for ten days to two weeks training.

13. Plaintiffs' exhibit no. 9.

(d) (e) Plaintiffs are contending the decision of United States of America v. Hayes International Corporation et al., 5 Cir., 456 F.2d 112, specifically stated that any relief that does not permit job skipping to reach "rightful place" is inadequate as a matter of law.

On invoking the equity powers of the Court, the Court does not review only one aspect thereof, but must view the total problem.

The Jackson Memorandum gives all employees who desired promotions an opportunity to move. It exceeds the requirement of the law in that they can, at any time, during the agreement period exercise their option, and even change their decisions, as many have in this case.[14]

Considering the training periods involved, safety and health requirements and qualifications, and that members of the class can only advance when vacancies occur, it is apparent the affected class members are progressing at an accelerated rate.

The application of these agreements (Jackson Memos) results in displacement of incumbent white employees. It is possible for an affected class member to be permanently promoted to a two-man job in which the incumbent is white, having worked the job for ten years. The black affected class member with eleven years plant seniority but only on the job for one day would effectively displace this incumbent white man when there is a lay-off. This, of course, exceeds the requirement of the law. However, since the unions and company agreed to the contract changes, there will be no modification of the seniority provisions.[15]

## SENIORITY

9. There is no discrimination in the contract. Affected class members are permitted and are using mill (plant) seniority to reach their rightful position. It is not the duty of this Court to rewrite every seniority system merely because there might be a better system. Until it becomes necessary for the Court to modify seniority rules because an existing system is discriminatory in effect, the company and the union should be permitted to continue their existing practices which have arisen over the course of their bargaining history. They know far better than third parties what is the best operational system. The Court finds that as applied, the seniority system works to the advantage of the class members who desire and qualify for promotion so as to expedite the advancement to their rightful place.

The plaintiffs presented volumes of statistical evidence purporting to show that black employees have not reached

---

14. Of the 324 affected class members, 189 voluntarily declined to apply for any transfer under the agreement, However, of the 189 who voluntarily declined to transfer, 135 were still offered at least one promotion in which they refused to accept; 76 of the 189 refused two or more promotions.

There were 212 transfer requests made by 119 affected class members, However, these 119 affected class members were given 109 opportunities to move and either refused them or attempted the job and returned on their own accord; 29 requests were for jobs in which there has not been any vacancies since the request. There have been 68 permanent transfers granted; four of these to jobs in which there was no line of progression.

The remaining 64 affected class members who are actively seeking advancement have received 406 temporary promotions and 254 permanent promotions during the four years and average 1.6 temporary promotions and one permanent promotion per employee each year.

15. A "rightful place" theory stands between a complete purge of "but-for" effects and maintenance of the status quo. The Act should be construed to prohibit the future awarding of vacant jobs on the basis of a seniority system that "locks in" prior racial classification. White incumbent workers should not be bumped out of their present positions by Negroes with greater plant seniority; plant seniority should be asserted only with respect to new job openings. This solution accords with the purpose and history of the legislation.

their rightful places. In many instances black employees had voluntarily "signed-out" of the lines of progression, that is to say they elected to remain in a particular job rather than to compete for promotion. This procedure permits junior employees, both white and black, to move around the signed-out employees to higher paying jobs in the lines.[16]

A study of the lines indicate that many members of the affected class have frozen themselves into their jobs by signing themselves out. These employees may, of course, sign back in to the line and then compete with whites based on their respective mill seniority, but they may not make up the ground they lost by having elected to sign-out of competition for job vacancies.

It is understandable to the Court that some employees, white or black, might elect to take the job security offered by the sign-out option. The pay rates are quite good under the existing contract —a base rated laborer, the lowest paying job in the entire plant receives $3.-485 per hour for his work.

## MAINTENANCE

10. The testimony was that the OFCC found no evidence of discrimination against blacks as a class as to maintenance workers even prior to 1962 and, for that reason, OFCC in the Jackson Conference did not call for action to be taken as to employees in maintenance departments. Plaintiffs in this case have not shown any actual discrimination in the maintenance departments and must, therefore, base their proof of discrimination against blacks in this department on statistics. IP has countered by showing that it has not engaged in overt discrimination in its maintenance departments, and that blacks are not excluded therefrom because of any unlawful educational or age requirements. On the contrary, IP has shown that it affirmatively seeks out qualified black mechanics both from within and without the mill and has otherwise recruited black applicants for employment. The evidence shows that all applicants are tested prior to hiring. In doing so the company uses testing procedures to disclose those applicants who possess the potential to meet the high skill levels which are necessary for maintenance employees and who can perform their duties in a safe and efficient manner. Incumbent employees who desire to transfer to maintenance are also required to pass certain tests before they are considered eligible for transfer. The Court's personal view of the complexities of the operation involved in the papermaking process indicate very graphically the high skills required of the maintenance personnel. This is even more obvious when you consider the mechanization taking place requiring both understanding of electronics and computers. But even at this mill, which is one of the older mills in the IP system, it was graphically demonstrated what could happen where unskilled and untrained personnel become involved with the not so complicated aspects of the operation. As for instance boilers operate under considerable pressure and one of them was nearly blown up by a non-qualified operator who happened to be a member of the affected class.

A principal part of plaintiffs' case has thus been a challenge to IP's testing program which plaintiffs say constitutes racial discrimination of the sort prohibited by Title VII.

## TESTING

11. International Paper Company has utilized personnel testing as a part of its employment procedures since 1954. At that time, following discussions with independent professional psychologists, the company instituted a testing program for maintenance applicants in an effort to upgrade its maintenance work force in the face of continuing mechanization and equipment sophistication occurring in the paper industry and also to remedy its dissatisfaction with prior training

16. Defendant's, International Paper Company, exhibits no. 25, 26 and 28.

and hiring practices based upon nepotism and employee referrals. Upon the success of this attempt to identify qualified maintenance employees and the continuous modernization of its production processes, the company expanded its personnel testing to production applicants in some mills in 1958 and extended the practice division-wide in 1962.

12. The current test batteries in use at the Mobile Mill for production and maintenance applicants with qualifying scores are:

Production
Wonderlic Personnel Test—15

Bennett Test of Mechanical Comprehension (Form AA)—20

or

Bennett Test of Mechanical Comprehension (Form BB)—12

Maintenance
Wonderlic Personnel Test—18

Bennett Test of Mechanical Comprehension (Form BB)—37

or

Bennett Test of Mechanical Comprehension (Form BB)—37

Minnesota Paper Form Board Test—45

13. All applicants for employment are scheduled for testing on a periodic basis, based solely upon order of application. The tests are administered in a controlled atmosphere by a test coordinator who follows the procedures outlined in the manuals prepared by the test publishers, and no challenge has been raised in this proceeding to the manner of administration or scoring of the company's personnel testing batteries. Since the adoption of the maintenance testing program in 1954 and the production program in 1962, all applicants for employment have been required to meet the established minimum test requirements for employment on these jobs.

14. At the trial, plaintiffs did not introduce evidence as to the total number of black and white applicants who had taken the test batteries in any identifiable period of time, how many had met the qualifying scores on the batteries, or the comparative qualifying rate of black and white applicants on the company's test batteries. Therefore, no evidence was offered concerning the impact of the company's testing program on the ability of blacks to obtain employment at the Mobile Mill.

15. Since its inception in 1954, the company has been engaged in a continuous process of reviewing its testing practices, and as early as 1966 it initiated a formal validation program under the guidance of Dr. Joseph Tiffin, a certified industrial psychologist and Professor of Industrial Psychology at Purdue University. Pursuant to his direction and that of Dr. William E. Scott, Jr., of Indiana University, who testified at trial, the company has undertaken a comprehensive process of validating its production and maintenance tests by the criterion-related method of test validation. This technique involves an empirical comparison of test scores and subsequent job performance to determine whether the test scores provide a reasonable prediction of an applicant's capability to perform successfully on the job.

16. Prior to undertaking the study, the company did an analysis of the jobs at the several mills of its Southern Kraft Division to determine whether various jobs had similar basic components from location to location. This comparison of jobs as well as the subsequent combination of jobs in some studies was verified with its consulting psychologists and with line supervisory personnel who were intimately familiar with job duties. In addition, a review of applicant populations at the various mills was conducted and it was determined that variables such as age and education level of applicants were closely comparable from mill to mill.

17. At this time, an effort was made to identify those jobs in the production lines of progression and maintenance categories which were among the most critical to mill operations and were jobs which employees could be expected to

reach in a reasonable period of time following employment. Because employees are not hired for specific production jobs, an applicant can be assigned to a labor pool serving any one of the lines of progression and can transfer to a different labor pool or be promoted to the base job in a line of progression in any part of the mill. Based upon this review of jobs, initial attempts were made to validate these critical and accessible jobs first, although validation has also been done on jobs at the bottom and top of lines of progression.

18. In gathering the data for the studies, the samples included all available employees in a job or functionally related category of jobs who met three criteria: (1) they had available test scores, (2) had been on the job for a reasonable period of time to permit meaningful evaluation, and (3) could be rated by a supervisor who was familiar with their work as well as the work of their co-workers who would be rated contemporaneously in order to arrive at a comparison of work performance.

19. After sample groups had been identified, the supervisors who were to rate the employees in question were given detailed instructions concerning the manner of conducting the rating and the specific factors which were to be considered in evaluating each employees' job performance. These included: quality of work, quantity of work, job knowledge, ability to direct a crew if required by the job, and safety awareness. In rating employees, the "paired comparison" technique was used so that a rater did not rank his men from one to ten in a way that the outcome would be easily controlled by his choice. Instead, each employee was compared once with every other employee in the sample and after all comparisons were made, the ranking was obtained by making a simple mathematical tally of all comparisons which had been made. Prior to performing the ratings, each rater was questioned to ensure that he had no knowledge of the test performance of employees he would be rating. This precaution eliminated bias based upon overt or subconscious tendencies to rate higher test scorers better on the job.

20. Following collection of the data on test performance and ratings of job performance, standard mathematical formulas were used to determine the correlation between the test scores and the job performance of the employees in the samples. In addition, expectancy charts were prepared to offer graphic representations of the correlation between test scores and probabilities of success on the job.

21. The results of these computations were thoroughly reviewed by Drs. Tiffin and Scott, as was the underlying data which went into them. Based upon this review, each offered the opinion, and this Court finds, that the statistically significant positive correlations between the test scores and the subsequent job performance of the employees evaluated demonstrated that the testing batteries being used by the company were valid and effective selection devices for obtaining employees with a reasonable probability of later success on the job.

22. One of the most striking differences between the testing program utilized by International Paper Company and the programs which have been reviewed in many cases under Title VII and 42 U.S.C., Section 1981 is the fact that this program involves long-term practices initiated well before the impact of Title VII which have been subject to a continuing process of validation. The validation of the company's test batteries is not a hasty effect at rationalizing past practices based upon impending litigation, nor have there been any complaints that International Paper Company uses the test results in a discriminatory fashion.

23. Notwithstanding this lack of evidence of adverse impact on minority applicants the company presented extensive documentary evidence and expert testimony on the issue of the job-related nature of its testing program. This evi-

dence demonstrated that the tests in question have been shown empirically to be highly correlated with successful performances on the maintenance and production jobs at the Mobile Mill. Having presented this evidence, the company has clearly established that the tests it is using "measure the person for the job and not the person in the abstract." *Griggs* [Griggs v. Duke Power Co.], 401 U.S. 424 at 436, 91 S.Ct. 849, at 856, 28 L. Ed.2d 158.

## SUPERVISION

■ 24. Plaintiffs point to the statistics which fail to reveal a significant number of blacks in supervisory jobs as evidence of racial discrimination. The testimony showed that foremen are generally selected from the lines of progression where they have acquired the necessary experience and training to qualify as foremen, *and defendants say that blacks simply have not been in the merged lines long enough to qualify. They argue further that it is reasonable to expect that as blacks advance up the lines of progression those who attain the necessary qualifications will become candidates for further advancement to the supervisory positions as vacancies occur. The Court accepts this as a rational basis to explain what might otherwise be considered a disparity in advancement opportunities for blacks as compared to whites. In reaching this conclusion the Court notes that no evidence has been presented in this case which shows that any qualified black has been denied a supervisory job because of his race.

17. Even though the Court might be in error in considering the 1968 Jackson Memorandum sufficient to comply with the law, the 1972 amendment thereof goes well beyond the requirements of the law and clearly reflects the attitude of the company and the unions in their desire to resolve these issues both from a business and sociological standpoint.

18. The statistical data furnished by IP shows not only permanent movement by AC's into formerly predominantly white jobs, it also shows movement via posted temporary vacancies, i. e., those expected

## CONCLUSIONS OF LAW

■ 1. The decision of the Court in *Herron-Fluker*, supra, is res judicata as to any issues concerning former Papermaker Local Unions 265, 265–A and 940, including union merger, processing of grievances for black members, promotion and seniority. Judge Pittman's decision also bars relitigation here of any individual claims of black employees who worked within the former Papermaker jurisdiction. Wasoff v. American Automobile Insurance Company, 451 F.2d 767 (5th Cir. 1971).

2. Defendants' motions for summary judgment are granted as to all issues raised relating to former Papermaker jurisdiction.

■ 3. Both the Company and former Sulphite Worker and Papermaker unions acted in good faith and made reasonable efforts to merge the lines of progression after 1962. These efforts were particularly successful in the Sulphite Workers jurisdiction prior to the Jackson Conference.

■ 4. The Jackson Conference was a good faith effort on the part of all parties to eliminate any remaining discrimination in the seniority and promotion system.[17]

■ 5. The Jackson Memorandum adequately provides Negro members of the affected class with a continuing opportunity to compete for vacancies with white employees on the basis of their mill or plantwide seniority to reach their "rightful place" in the seniority system.[18] Immediately after the ratifi-

to last over 30 days. Because of frequently recurring vacancies, employees classified at one job level often receive temporary promotions to the next higher job where they may receive even higher temporary promotions. The testimony was that there are many, many more temporary vacancies of less than 30 days which AC's fill in accordance with the terms of the Jackson Memorandum. The Court finds from all of the evidence that every qualified AC who desired to promote or transfer to better jobs under the Jackson Memorandum has had the opportunity

cation of the Jackson Memorandum each affected class member was interviewed and then offered an opportunity to transfer to a different department based on the seniority rules of the Jackson Memorandum. Title VII requires only that a seniority scheme fairly affords class members the opportunity to reach their rightful place. United States v. Hayes International Corp., 456 F.2d 112 (5th Cir. 1972).

6. An employer has no obligation to transfer class members to jobs for which any of those individuals are not qualified. *Hayes,* supra.

7. No seniority system should be amended or rewritten by the Court absent evidence that such system perpetuates past discrimination by "freezing" or "locking" blacks into the lower paying jobs. Heard v. Mueller Co., 464 F. 2d 190 (6th Cir. 1972). The statistics offered here do not prove that under the Jackson Memorandum blacks are frozen into the pre-1962 job structure. Many blacks who have failed to move up the lines of progression have voluntarily signed-out of the promotional system.

8. The contractual seniority system itself is, of course, plainly legal on its face and does not discriminate. Local 189 v. United States, 416 F.2d 980 (5th Cir. 1969).

9. The Court concludes that the seniority system provided by the collective bargaining agreement, as modified by the 1968 Jackson Memorandum, adequately provides for blacks to reach their "rightful place" in the Company's employment scheme, according to their qualifications. Substantial effort on the part of the defendants to remedy historic or traditional segregation may alleviate the necessity for Court-imposed, injunctive relief. Brown v. Gaston County Dyeing Machine Co., 457 F. 2d 1377 (4th Cir. 1972).

10. Employment practices which perpetuate or tend to perpetuate past discrimination are forbidden by Title VII to the extent they are not supported by overriding legitimate, non-racial business necessity. Griggs v. Duke Power Co. (1971), 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158; Rowe v. General Motors Corp. (5th Cir. 1972), 457 F.2d 348. It is not enough under Title VII that the procedures utilized by employers are fair in form, they must be, in fact, fair in operation. Rowe v. General Motors Corp., supra. In this case defendants' procedures are both fair in form and fair in fact.

11. In the evidence presented at trial, plaintiffs have failed to meet their threshold burden of proof to demonstrate that the testing program of the company operates to disqualify blacks at a substantially higher rate than white applicants. As the Supreme Court notes in Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), this is a critical component of a claim of unlawful employment discrimination. There is no requirement that prior to implementation of an intelligence test as an employment criterion the employer must validate its ability to forecast job performance. Rather, once plaintiff shows a discriminatory effect, the burden shifts to defendant to prove the test's validity. Cooper v. Allen, 467 F.2d 836 (5th Cir. 1972).

12. An award of back pay, costs, and attorneys' fees is discretionary with the Court. The Act provides that they may be awarded, 42 U.S.C., Section 2000e–5(g). Inasmuch as the Court finds that the seniority system as it now exists is free of any "lock-in" discrimination; there is no discrimination in working conditions; the sincere effort of the company and the unions to eliminate past discrimination; plus

to do so if his mill seniority was greater than others applying for the same vacancy. It further finds that the vast ma-

jority of those who have not declined to promote have received not one but several promotions.

the high monetary cost of training the company has endured and will continue to endure, the Court declines to award plaintiffs back pay and likewise denies the request of plaintiffs' counsel for attorneys' fees. A judgment will be entered for the defendants.