**Jessie STEVENSON et al., etc., Plaintiffs-Appellants,**

v.

**INTERNATIONAL PAPER COMPANY, MOBILE, ALABAMA, et al., Defendants-Appellees.**

No. 73–1758.

United States Court of Appeals, Fifth Circuit.

July 16, 1975.

Jack Greenberg, Sylvia Drew, Morris J. Baller, New York City, J. U. Blacksher, Mobile, Ala., for plaintiffs-appellants.

Wm. A. Carey, Gen. Counsel, EEOC, Margaret C. Poles, Washington, D. C., amicus curiae.

R. F. Adams, Brock B. Gordon, Mobile, Ala., for Int'l Paper Co.

Benj. L. Erdreich, John C. Falkenberry, Birmingham, Ala., for United Paperworkers Int'l Union.

James D. Hutchinson, N. Thompson Powers, Washington, D. C., for International Paper Co.

Before GOLDBERG and RONEY, Circuit Judges, and LYNNE, District Judge.

RONEY, Circuit Judge:

Black employees at International Paper Company's Mobile, Alabama, mill brought this class action against International Paper Company (IP), their employer, and the various labor unions involved, asserting racial discrimination in two broad categories: first, transfer and promotion practices presently discriminatory, and second, practices which, although neutral on their face, perpetuate the effects of past discrimination. Although not always so, present hiring practices are concededly nondiscriminatory. Specifically, however, the Title VII complaint, filed after EEOC conciliation had failed, attacked as discriminatory the testing, seniority and certain other requirements for promotion and transfer purposes. The district court held for the employer on all issues.

We hold that the court erred in giving undue res judicata effect to prior litigation by the employees against certain unions, but not the employer, in the so-called *Herron-Fluker* cases. We cannot ascertain the extent to which this error permeated the findings and conclusions of the district court. In addition, a large number of cases with extensive opinions explicating the developing law in this field have been issued since the date of the district court's order, December 7, 1972. In view of these recent cases, it is apparent that the district court erred in ruling that compliance with the agreements approved by the Office of Federal Contract Compliance, the so-called Jackson Memorandum, was sufficient to show compliance with Title VII.

The principal cases upon which we rely and to which we commend the district court's attention on remand are: Baxter v. Savannah Sugar Refining Corp., 495 F.2d 437 (5th Cir.), cert. denied, 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974); Franks v. Bowman Transportation Corp., 495 F.2d 398 (5th Cir. 1974), cert. granted, 420 U.S. 989, 95 S.Ct. 1421, 43 L.Ed.2d 669 (1975); Pettway v. American Cast Iron Pipe Co., 494 F.2d 211 (5th Cir. 1974); Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364 (5th Cir. 1974); United States v. Georgia Power Co., 474 F.2d 906 (5th Cir. 1973). *Pettway* contains appropriate reference to practically every case in this Circuit in which the issues presented in this appeal are involved. The application of these cases is for the initial consideration of the trial court after making findings as to the controlling facts.

We vacate and remand for full consideration of plaintiffs' claims in light of the correct legal standards set forth in these cases and this opinion.

The claims asserted are of the type now familiar to this Court and known collectively as a "Title VII" suit, even though the claims are alleged not only under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e et seq., but also under 42 U.S.C.A. § 1981, and under the duty of fair representation subsumed in the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. As in most Title VII cases the facts are particularly important in evaluating the plaintiffs'

claims. We will outline the facts briefly here and give them in more detail where necessary in the discussion of the law.

## I. FACTS

So far as relevant here, the work force is divided into three groups—production, maintenance and supervisory. The production jobs are arranged in several lines of progression. That means that a new employee starts at the bottom and advances, a step at a time, as vacancies occur in higher paying jobs.

The maintenance department consists largely of higher paying craft jobs. These positions are filled by journeymen or apprentices IP has itself trained. Apprentices may be chosen from production workers but such workers must fulfill age, education and testing requirements. Basically, the production jobs are concerned with making the mill's primary product, paper, while the maintenance employees are responsible for keeping the plant and equipment running. Maintenance employees are generally more highly paid and more skilled.

Except for "straw bosses" in the maintenance department, supervisors are salaried employees. Most lower-level supervisors and foremen are former hourly paid employees promoted from the ranks.

There is no dispute that prior to September 1962, IP operated on a segregated basis, pursuant to the policy of IP and the unions. All black employees had the lowest paid and most menial jobs in the production department. All the other departments and the lines of progression leading to the best paid jobs in the production department were reserved for whites.

The local unions, which had jurisdiction over the jobs within the department, were also racially segregated. The all-black locals of the International Brotherhood of Pulp, Sulphite and Paper Mill Workers (Sulphite Workers) and United Papermakers and Paperworkers, AFL–CIO (Papermakers) represented black employees, and the all-white locals of the Sulphite Workers, Papermakers and International Brotherhood of Electrical Workers unions represented the whites.

In September 1962, responsive to Executive Order No. 10925 relating to non-discriminatory employment practices required of government contractors, IP, with the cooperation of the unions, abandoned its prior policy, desegregating the personal facilities and opening the various lines of progression to everyone. No actual job desegregation occurred, however, as whites and blacks continued to migrate to those jobs in which their race was in the majority. This is understandable, as the various lines of progression were within the work jurisdiction of different, segregated locals of the various unions.

In May 1966, the Sulphite Workers merged their previously racially segregated locals and merged the lines of progression under their jurisdiction. Since the relationship of the jobs after the merger of the lines was based on the relative pay rates and the black jobs were basically menial and low-paying, the effect was to "stack" the white lines on top of the black lines, locking the blacks into the lower paying jobs.

In 1968, black employees complained to the Office of Federal Contract Compliance (OFCC) which was charged with the enforcement of Executive Order No. 11246, the successor of No. 10925. After investigation OFCC notified IP that it was in violation of the order and proposed a 12-point plan to achieve compliance. This led to a meeting in August 1968, at Jackson, Mississippi, between representatives of IP, the unions, the locals and OFCC. An agreement was reached which modified the then-existing collective bargaining agreement in the production department. This agreement was reflected in the Jackson Memorandum of Understanding. It did not encompass the maintenance department at the Mobile mill or the supervisory jobs.

The object of the Jackson Memorandum was to provide blacks, who had previously been subjected to employment discrimination, the opportunity to reach

their rightful place in the mill labor force.

After IP had been administering the Jackson Memorandum for less than a year, the unions challenged the interpretation which IP had given some of its provisions. OFCC was requested to settle the dispute. Around the first of May 1969, IP received a letter from OFCC, referred to by all parties as the McCreedy Letter, which authorized IP to modify its administration of the Jackson Memorandum, thereby restricting some of the opportunities previously available to former discriminatees.

A second Jackson Memorandum was negotiated in 1972, which agreement expanded the opportunities of former discriminatees, partially by repudiating the restrictions contained in the McCreedy Letter. The 1972 Jackson Memorandum was in effect at the time the district court rendered its decision in December 1972, but it had not been administered long enough to ascertain what effect it might have on former discriminatees.

The Jackson Memorandum did not attempt any change in the practices relating to the maintenance craft positions, only in those regarding production positions. While a production employee progresses up a "line of progression" within his department, some lines having fifteen or more positions, the maintenance crafts generally have two positions, apprentice and journeyman. While in the apprentice position, the employee gains the skill and experience necessary independently to accomplish the mission of the journeyman. Since 1954, when IP recognized the increasingly complex technology developing in the paper industry, an applicant for a maintenance apprenticeship has been required to achieve a minimum score on a battery of tests, whether he was applying for original employment in maintenance, or transferring from the production department or another maintenance craft position into the apprentice position. Passage of the battery of tests relieves an applicant from IP's requirement for new maintenance employees to have a high school education. Since 1966, IP has continually evaluated its maintenance selection procedures to insure that they were effectively screening applicants.

## II. THE HERRON–FLUKER CASES AND RES JUDICATA

As their first argument on appeal, plaintiffs contend that the district court erred in holding that plaintiffs were precluded from litigating certain issues in the instant case by the doctrine of res judicata. Specifically, plaintiffs challenge as error the district court's conclusion that the decision of the court in the Herron-Fluker cases is res judicata:

. . . as to any issues concerning former Papermakers Local Union 265, 265–A and 940, including union merger, processing of grievances for black members, promotion and seniority. Judge Pittman's decision also bars relitigation here of any individual claims of black employees who worked within the former Papermakers jurisdiction.

Plaintiffs concede that judgment of the court in Herron-Fluker is res judicata as to the narrow questions of the 1968 merger of black Papermakers Local 406 into predominately white Papermakers Locals 265 and 940 and the alleged failure of those white locals to represent their new black members' interests fairly and adequately. Plaintiffs argue, however, that the decision of the court in Herron-Fluker does not bar the instant action against Papermakers for systematic discrimination in employment opportunities. We agree with the plaintiffs.

For a prior judgment to bar a subsequent action, it is firmly established (1) that the prior judgment must have been rendered by a court of competent jurisdiction; (2) that there must have been a final judgment on the merits; (3) that the parties, or those in privity with them, must be identical in both suits; and (4) that the same cause of action must be involved in both suits. Wasoff v. American Automobile Ins. Co., 451 F.2d 767 (5th Cir. 1971). If these elements are established, then the judg-

ment or decree upon the merits in the first case is an absolute bar to the subsequent action or suit, not only in respect of every matter which was actually offered and received to sustain the demand, but also as to every ground of recovery which might have been presented. Baltimore S. S. Co. v. Phillips, 274 U.S. 316, 47 S.Ct. 600, 71 L.Ed. 1069 (1927), as cited in Astron Industrial Associates v. Chrysler Motors Corp., 405 F.2d 958 (5th Cir. 1968).

The principle difficulty in applying the doctrine of *res judicata* is determining whether the cause of action in the first suit is identical to that in the second. This court has recognized that "the principle test for comparing causes of action is whether or not the primary right and duty and delict or wrong are the same in each action." Seaboard Coast Line R. R. Co. v. Gulf Oil Corp., 409 F.2d 879, 881 (5th Cir. 1969). In the *Seaboard Coast Line* case, the court quoted from Baltimore S. S. Co. v. Phillips, *supra,*

A cause of action does not consist of facts, but of the unlawful violation of a right which the facts show. The number and variety of the facts alleged do not establish more than one cause of action so long as their result, whether they be considered severally or in combination, is the violation of but one right by a single legal wrong.

409 F.2d at 881.

■ There is no one test for deciding whether the substances of two actions are the same for the purposes of *res judicata*. As this Court noted in Acree v. Air Line Pilots Assn., 390 F.2d 199 (5th Cir.), cert. denied, 393 U.S. 852, 89 S.Ct. 88, 21 L.Ed.2d 122 (1968), various tests have been advanced, including

Is the same right infringed by the same wrong? Would a different judgment obtained in the second action impair rights under the first judgment? Would the same evidence sustain both judgments?

In conclusion, it is important to remember that

"Res judicata is a principle of peace. Under its influence an end is put to

controversies. Parties and their privies are made to abide definitive and final judgments and litigations are concluded."

Res judicata rests on a rule of public policy designed to put an end to mere contentious litigations. Under that rule an issue once finally settled by the judgment of a court of competent jurisdiction, remains settled. "Public policy dictates that there be an end of litigation; that those who have contested an issue shall be bound by the result of the contest; and that matters once tried shall be considered forever settled as between the parties."

. . . the rule of res judicata does not go on whether the judgment relied on was a right or a wrong decision. It rests on the finality of judgments in the interest of the end of litigation and it requires that the fact or issue adjudicated remain adjudicated. It, in short, is that one, who has permitted a final judgment to go against him is estopped, by that judgment, from contending elsewhere, against the parties to it and their privies that the fact or issue is otherwise than as there adjudged.

Bennett v. Commissioner of Internal Revenue, 113 F.2d 837, 839–840 (5th Cir. 1940) (footnotes omitted).

■ Where a second action between the same parties is upon a different cause of action, the principle of *res judicata* is applied much more narrowly. In this situation, the judgment in the prior action operates as an estoppel, not as to matters which might have been litigated and determined, but only as to those matters in issue or points in controversy which were actually litigated and determined in the first proceeding. In this sense, *res judicata* is usually and more accurately referred to as an estoppel by judgment, or collateral estoppel. *See* Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948); Cromwell v. County of Sac, 94 U.S. 351, 24 L.Ed. 195 (1876).

■ In simple terms, collateral estoppel means that ". . . when a issue

of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). This Court has stated that the three traditional requirements for the application of the doctrine of collateral estoppel are

(1) The issue to be concluded must be identical to that involved in the prior action; (2) in the prior action the issue must have been "actually litigated"; and (3) the determination made of the issue in the prior action must have been necessary and essential to the resulting judgment.

James Talcott, Inc. v. Allahabad Bank, Ltd., 444 F.2d 451, 458–459 (5th Cir.), cert. denied, 404 U.S. 940, 92 S.Ct. 280, 30 L.Ed.2d 253 (1971).

It is against these basic principles that we must test the effect of the prior litigation upon the issues plaintiffs seek to litigate in this case.

In 1969, black plaintiff members of Local 406 employed at the Mobile mill filed a class action suit against United Papermakers and Paperworkers, AFL–CIO, in the United States District Court for the Southern District of Alabama. Herron v. United Papermakers & Paperworkers, AFL–CIO, No. 5665–69–P (S.D. Ala.).

Shortly thereafter, another class of plaintiffs as former members of Local 406 filed suit against Locals 265 and 940, United Papermakers and Paperworkers, AFL–CIO, and the International Union. Fluker v. Locals 265 and 940, United Papermakers & Paperworkers, AFL–CIO, No. 5839–70–P (S.D.Ala.). These cases were consolidated for trial and the district court issued an unreported opinion on December 9, 1971.

The factual background of the Herron-Fluker cases is the same as the one in the case sub judice. It is helpful, however, to outline the factual particulars which provoked the Herron-Fluker litigation in order to understand the precise wrongs which the Herron-Fluker plaintiffs sought to redress.

Pursuant to the Jackson Memorandum, IP and the union devised a method of merging lines of progression which were formerly segregated on the basis of race. Part and parcel of the merger of the lines of progression included the merger of all black Papermakers Local 406 into predominately white Locals 265 and 940. Effective April 30, 1969, the International union revoked the charter of Local 406 and transferred 117 of its members to Local 265 and 38 of its members to Local 940. These transfers made a total membership in Local 265 of 534, 392–397 white and 142–137 black; and a total membership in Local 940 of 283, 235–237 white and 48–46 black. It is without dispute that the merger of Local 406 into Locals 265 and 940 was the major precipitant of the Herron-Fluker litigation.

A complete review of the Herron-Fluker record reveals that the wrongs which the Herron and Fluker plaintiffs sought to redress in that litigation were (1) the merger of Local 406 into Locals 265 and 940 without protective transitional arrangements and (2) the alleged failure of Locals 265 and 940 to represent fairly the interests of their new black members. Both the Herron complaint, seeking injunctive and declaratory relief pursuant to Title VII of the Civil Rights Act of 1964 and the National Labor Relations Act, and the Fluker complaint, seeking similar relief under 42 U.S.C.A. § 1981 and the National Labor Relations Act, focus on the issues of merger and fair representation. In the joint pre-trial document, plaintiffs identify their case as a proceeding to establish entitlement of the former members of Local 406 to protective transitional arrangements in the merger of the union with Locals 265 and 940. And, although the district court begins its opinion in Herron-Fluker by characterizing the case as a class action to correct alleged racial discrimination in the promotion practices of the Mobile mill and Locals 265 and 940, the district court properly identifies plaintiffs' complaints as (1) an objection to the transfer of blacks into white unions without some transitional protec-

tion, and (2) an allegation that, since the merger, the predominately white unions have not fairly represented the interests of new black members.

The substance of defendants' argument on appeal is that the *Herron-Fluker* plaintiffs interjected the issues of promotion and seniority into the *Herron-Fluker* case in their Supplementary Pre-Trial Statement. Defendants contend that even if the matter of discrimination in hiring, promotion and seniority practices was not raised in *Herron-Fluker*, it could have been litigated there. Thus, defendants assert that, under the doctrine of *res judicata*, plaintiffs are barred from maintaining the instant action against Papermakers for systematic discrimination in employment opportunities.

A careful reading of the *Herron-Fluker* transcript indicates that plaintiffs introduced evidence of employment discrimination only as a background to their demands for protective transitional arrangements and fair representation. As the district court noted in the *Herron-Fluker* opinion, the manner in which the lines of progression were merged under the Jackson Memorandum and the validity of aptitude tests for certain jobs in the mill were not issues in *Herron-Fluker*. In contrast, the case at bar presents a direct attack against those actions and practices of International Paper, Sulphite Workers, and Papermakers which allegedly perpetuate a system of employment discrimination. Under any one of the three tests which this Court recognized in Acree v. Air Line Pilots Assn., 390 F.2d 199 (5th Cir.), cert. denied, 393 U.S. 852, 89 S.Ct. 88, 21 L.Ed.2d 122 (1968), the causes of action in *Herron-Fluker* are not identical to plaintiffs' instant action for redress of systematic discrimination in employment opportunities. *Herron-Fluker* bars the relitigation of the issues of merger and fair representation, strictly union practices, but it does not prevent plaintiffs from otherwise maintaining their suit against IP and the unions for the company's transfer and advancement practices, joint union-company policies.

## III. PRODUCTION DEPARTMENT SENIORITY SYSTEM (JACKSON MEMORANDUM)

On appeal the plaintiffs have mounted a multifaceted attack on the district court's determination that the seniority system at IP after the Jackson Memorandum of 1968 fully reflected the "rightful place" doctrine which has long described this Court's approach to a Title VII remedy. *See* Local 189, United Papermakers & Paperworkers v. United States, 416 F.2d 980 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970); 42 U.S.C.A. § 2000e–2(h). We agree that, irrespective of the federal Government's involvement in the formulation of the Jackson Memorandum, our recent cases have made clear that IP's seniority practices perpetuated vestiges of past discrimination. This Court has previously noted that passage of Title VII was sufficient to place employers on notice that racially discriminatory practices were unlawful, Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 255 (5th Cir. 1974); Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364, 1377 (5th Cir. 1974), and that reliance upon Government approval of or participation in the formulation of the employment practice is not generally a defense in a Title VII suit. *See, e. g., Local 189,* 416 F.2d at 997. The seniority system must be measured against the requirements of Title VII and our cases construing that title.

■ Our recent cases have made clear that IP's transfer and promotion practices, embodied in the seniority system, contain possibly impermissible vestiges of IP's prior overt discrimination. *See, e. g., Pettway, supra; Johnson, supra;* United States v. Hayes International Corp., 456 F.2d 112 (5th Cir. 1972). We are unable to determine from the district court's decision, however, whether the offending practices make the seniority system in violation of Title VII. We know that any facially neutral employment practice, such as requiring position-by-position advance up a line of progression (*i. e.,* no "job skipping"), which per-

petuates past bias, for example, by slowing a discriminatee's advancement unnecessarily, is considered presently discriminatory. Such a neutral practice, however, may not invalidate a seniority system under Title VII if IP can demonstrate that the practice is justified by business necessity. Franks v. Bowman Transportation Co., 495 F.2d 398, 416 (5th Cir. 1974), cert. granted, 420 U.S. 989, 95 S.Ct. 1421, 43 L.Ed.2d 669 (1975). Because the district court did not consider whether some of IP's neutral practices are presently so discriminatory, it did not make findings regarding their impediment or the business necessity of the practices which do in fact impede.

▪ In particular, the district court should reexamine the red circling provision and its limitations, the absence of advanced entry levels and job skipping as it hinders more rapid advancement, and the residency and recall requirements under the McCreedy Letter. If the court finds that in fact any of these practices hindered or discouraged any "affected class"[1] member from reaching or seeking to reach his rightful place, IP should then be given the opportunity to prove that the practice was required by business necessity during the period it was used. It is clear that in theory the absence of such provisions may impede an AC's advancement, but we do not hold as a matter of law that there should always be job skipping, advanced entry, unlimited red circling or any other remedy. The requirement for and feasibility of the remedy turn on factual matters. IP's seniority system was inadequate, however, as long as it did not have provisions for whichever of these remedies could have been implemented without creating a needlessly unstable situation.

The district court is free on remand to take new evidence on any issue as it

deems appropriate. We recognize that the seniority system at IP's Mobile plant has been modified by another Jackson Memorandum, written in 1972, and, therefore, injunctive relief against the practices under the old system might be inappropriate. See Pettway, supra at 244. This is for the district court to consider in the first instance. The fact that the practices have been abandoned will not relieve the court from deciding their discriminatory effect vel non, however, as such findings will bear upon possible back pay liability. The court should carefully examine each practice for its discriminatory effect and make specific findings on such effect. For such aid as it may be to the parties and the district court on remand, we will discuss in some detail the problem areas of the seniority system.

### A. Red Circling.

▪ It is now clear that red circling is a necessary element of a Title VII remedy in most cases. See, e. g., Pettway, 494 F.2d at 248 n.99. Plaintiffs offer two objections to the red circling provided in the Jackson Memorandum: (1) it was limited to employees with a permanent rate of $3.00 per hour or less, even though some ACs were making more than that, and (2) it was available only if an application to transfer was filed within six months of the Jackson Memorandum's effective date. Plaintiffs argue that neither restriction on the availability of red circling can be justified by business necessity, as they must be if they impede or restrict the movement of former discriminatees to their rightful place. See Johnson v. Goodyear Tire & Rubber Co., 491 F.2d at 1374 n.28; Long v. Georgia Kraft Co., 450 F.2d 557 (5th Cir. 1971). The district court did not specifically consider this issue, and on remand it should do so.

1. The Jackson Memorandum defined the "affected class" as "Negroes employed prior to September 1, 1962," when IP had opened all lines of progression to all races, and "Negroes employed since September 1, 1962, but initially placed in a job line of progression formerly considered as an all-Negro job or line of progression." A member of the affected class will be referred to as an "AC" and any other employee of IP as a "NAC" for "non-affected class member."

It is clear that, in theory, a $3.00 per hour limitation on availability of red circling could inhibit an AC's movement, penalizing his choice to transfer by cutting his pay. *See Pettway,* 494 F.2d at 223. The evidence in this case, however, is scant on the existence, in fact, of any AC who was so inhibited. The only evidence to which plaintiffs direct us is the testimony of an IP executive that there were "probably" a few ACs being paid at a rate higher than that. If the plaintiffs can demonstrate on remand that the limitation presented, or as presently existing does present, a practical impediment to any ACs, the district court should take appropriate action.

The time limitation to take advantage of red circling is similarly not *per se* unlawful. This Court has frequently recognized that the employer has an interest in reestablishing stability to his work environment and that reasonable time limitations on the extraordinary system created to provide relief for prior discriminatees is permissible. *See, e. g., Franks,* 495 F.2d at 417 n.16; Johnson v. Goodyear Tire & Rubber Co., 491 F.2d at 1374; United States v. Jacksonville Terminal Co., 451 F.2d 418, 459 (5th Cir. 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972). This cannot be considered in a vacuum, however, but must be viewed in light of the entire remedy afforded. Since the district court found that IP had conscientiously implemented the Jackson Memorandum and that all ACs who had desired to transfer had been given the opportunity when one arose, it may be that the time limitation, too, presented only a theoretical and not a practical restraint on AC movement. The district court may properly reconsider this entire issue on remand.

B. *The McCreedy Letter Modifications to the Jackson Memorandum.*

■ The McCreedy Letter resulted in two changes in IP's administration of the mill seniority provisions. First, an AC had to be permanently assigned to the position immediately below a vacancy in order to bid for the vacancy. Prior to the McCreedy Letter, IP had allowed an AC to bid for a vacancy when the AC was even temporarily assigned to the immediately inferior position in the line of progression. The second change was in the utilization of "recall rights." Prior to the McCreedy Letter an AC was allowed to advance using mill seniority even when competing with a NAC who had "contractual" recall rights to the job for which they were competing. The McCreedy Letter authorized giving the NAC with recall rights a preference, regardless of mill seniority.

It is obvious that the effect of the two changes authorized by the McCreedy Letter was to slow the advancement of the ACs to their rightful place. It is equally obvious that these two policies could not be justified as required by business necessity: less racially discriminatory solutions not only existed, but had previously been used by IP. *Cf. Pettway,* 494 F.2d at 244–245; *Jacksonville Terminal Co.,* 451 F.2d at 451–453. The Jackson Memorandum of 1972 rejects both of the McCreedy Letter practices, so their effect on possible injunctive relief in this case may be minimal. The restrictions may be important, however, in deciding whether back pay is to be awarded to the class members.

■ Unlike our previous cases, here the Government did more than merely acquiesce in racially discriminatory private conduct. When left to construe the Jackson Memorandum for itself, IP had applied it significantly more liberally in assisting ACs to reach their rightful place. It may be that this "government-imposed" discrimination will tip the scales in favor of finding "substantial injustice," which would relieve IP of the requirement to make restitution to the ACs by payment of back pay. This is better left to the district court which can consider these factors in conjunction with any other relevant evidence on back pay liability. For example, the court should also consider the extent to which the unions, whose disagreement with IP's policy spawned the McCreedy Let-

ter, might be held separately liable for pack pay, *cf.* Carey v. Greyhound Bus Co., 500 F.2d 1372, 1378–1379 (5th Cir. 1974), and the possibility that IP might be liable for back pay only to those ACs who were impeded by the inadequacies of the Jackson Memorandum other than the McCreedy Letter modifications. This is a complex issue which has never been fully considered by the district court.

### C. *Shortening of Lines of Progression, Advanced Entry Levels and Job Skipping.*

Plaintiffs argue the Jackson Memorandum was inadequate to remove all impediments to ACs reaching their rightful place because of the absence of either mandatory provisions allowing them to enter a line of progression above the normal entry level and to skip positions not necessary to provide training for high level jobs, or a mandatory provision that the lines of progression be shortened. *See Pettway*, 494 F.2d at 248–249; *Hayes International Corp.*, 456 F.2d at 117–119; *Long*, 450 F.2d at 560.

While the district court erred in not subjecting the requirements of the present seniority system to the close scrutiny required for a showing of business necessity, it did express respect for the complexity of IP's Mobile mill operation and for the functional interrelationship of the jobs in the lines of progression. *See* 352 F.Supp. at 237 nn.5–6. Therefore, we pretermit consideration based on a cold record of whether all elements of the old system could be justified as required by business necessity, with no less discriminatory alternatives available to IP. Again, the resolution of some of these issues may be important only in determining issues of back pay significance. It probably will be necessary, for example, to determine which jobs could have been skipped and which positions ACs could have entered at above the normal entry level to decide who, if anyone, is entitled to back pay for being deprived of their rightful economic place and how much the award should be. It is clear, however, that the total absence of job skipping from the 1968 Jackson Memorandum remedy cannot be justified as a business necessity in light of IP's ability to institute it in 1972, apparently without significant disruption.

Advanced entry levels may also be a proper subject for injunctive relief, when the district court reconsiders this case on remand. Forcing a former discriminatee to transfer to the lowest job in a line of progression can only be required if it can be justified by business necessity. If the entry level cannot be so justified, former discriminatees must be allowed to transfer into a line as high as their qualifications and mill seniority will allow.

We note that under the 1972 Jackson Memorandum, IP has begun to operate under a somewhat different system, establishing a "residency period" for each job, but with at least twenty-four jobs having a zero residency period. In effect, then, these twenty-four jobs may be skipped by an AC advancing to his rightful place. On remand, the district court should now examine the new system, including the residency period for each job, if challenged by plaintiffs, to insure that the system restrains ACs no more than the minimum justifiable under the business necessity test. *See Pettway*, 494 F.2d at 248–249; *Hayes International*, 456 F.2d at 117–119.

We are aware that many of the "benefits" of the Jackson Memorandum accrued not only to blacks who had been the victims of prior discrimination, but to all IP employees. This understandable desire on the part of IP and the unions to provide the benefits to all employees, coupled with their apparent concern not to create a highly unstable situation at the Mobile mill, may explain some of the provisions of the Jackson Memorandum. This desire to maintain stability while avoiding the appearance of preference does not justify, however, failure to provide a remedy which makes the prior discriminatee whole as far and as fast as possible. *See Franks*, 495 F.2d at 415–416.

In summary, we remand the issue of the seniority system for the production department for reconsideration in light of our recent cases, not available to the district court on initial consideration, but which more fully explicate the correct allocation of burdens of proof on such issues. The district court is free to receive whatever evidence it feels necessary in light of our opinion and remand, and to determine the appropriate remedy, following the guidance of the cases cited herein and considering any facts which are presented to the court. We note that nothing in this opinion should be taken to mean that IP must place anyone in a job for which he is not qualified. Of course, the qualifications must be *bona fide* and meet the test of business necessity. *Pettway*, 494 F.2d at 248–249; *Local 189*, 416 F.2d at 988.

## IV. MAINTENANCE CRAFT POSITIONS

Plaintiffs assert that IP's practices regarding the maintenance craft positions have elements of both present discrimination and "neutral" policies which perpetuate past bias in hiring. Their allegations of present prejudice center on the battery of tests which any applicant for a maintenance craft job must pass. The presently neutral requirements which have the effect of "locking in" the effects of past discrimination are the maximum age restriction for entry into maintenance crafts, and the length of the apprenticeship. The district court found against plaintiffs on all of these issues. Plaintiffs attack the district court's conclusions as clearly erroneous factually and as based on incorrect legal analysis.

A. *Testing Requirements for Maintenance Craft Positions.*

At the time of trial, IP required all applicants for any maintenance craft position, whether a new applicant or a current employee seeking to transfer, to take and pass a battery of three tests: The Wonderlic Personnel Test (passing score 18); The Bennett Test of Mechanical Comprehension (passing score 45 [Form AA] or 37 [Form BB]); and the Revised Minnesota Paper Form Board Test (passing score 45). Counsel for IP informed the court at oral argument that the Minnesota Paper Form Board Test is no longer administered by IP as an element of its maintenance craft selection process.

The district court found that plaintiffs did not carry the initial burden of demonstrating that IP's testing program operates to disqualify blacks at a substantially higher rate than white applicants. 352 F.Supp. at 246, 249; *see* Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The court also found that the extensive documentary evidence and expert testimony which IP presented on the job-relatedness of its testing program demonstrated that the tests "measure the person for the job and not the person in the abstract." 352 F.Supp. at 247–248. Plaintiffs contend that the district court erred both in concluding that the testing requirement had no disparate impact and in finding that IP had adequately validated its testing battery.

The problem we have with this issue is our inability to determine what the district court meant by the statement:

At the trial, plaintiffs did not introduce evidence as to the total number of black and white applicants who had taken the test batteries in any identifiable period of time, how many had met the qualifying scores on the batteries, or the comparative qualifying rate of black and white applicants on the company's test batteries. Therefore, *no evidence was offered concerning the impact of the company's testing program* on the ability of blacks to obtain employment at the Mobile Mill.

352 F.Supp. at 246 (emphasis added). On appeal plaintiffs point to the evidence they offered in the trial court: an exhibit purporting to analyze the pass-fail rate for black and white transfer applicants for a given period, expert testimony on the general disparate impact of written aptitude tests, an "exhaustive

statistical study" of scoring patterns according to race prepared by the publishers of the Wonderlic test, the testimony of some black IP employees regarding their own difficulty in passing the tests, and the unexplained absence of a significant number of blacks in the maintenance craft positions. Plaintiffs contend that the sparsity of evidence is explained in part by IP's objections to some of plaintiffs' discovery and the district court's circumscription of plaintiffs' examination of IP employees at trial. *See* Rogers v. International Paper Co., 510 F.2d 1340, 1348–1349 (8th Cir. 1975), petition for cert. filed, 43 U.S.L.W. 3666 (U.S. May 17, 1975) (No. 74–1446). Defendants do not defend the "no evidence" finding by the district court but instead attempt to discredit the evidence plaintiffs did offer. It is apparent that the district court was clearly erroneous in finding no evidence of disparate impact.

We are disinclined, however, initially to weigh the evidence on appeal on the admittedly sparse record. This case is being remanded for other reasons anyway, and we consider it a better practice to require the district court to consider and evaluate the evidence, receiving new evidence as appropriate. Plaintiffs will then have an opportunity to discover and present evidence on the impact of the tests at IP's Mobile mill.

If upon remand the district court finds the tests have a disparate impact on blacks, *see* Rogers v. International Paper Co., *supra*, it is clear that the validation is inadequate as a final validation under our holding in United States v. Georgia Power Co., 474 F.2d 906 (5th Cir. 1973). The district court did not have the benefit of that exhaustive opinion when considering this case initially and, consequently, found the test battery to be validated, even though the validation procedure did not follow EEOC guidelines, as generally required under *Georgia Power Co. See Pettway,* 494 F.2d at 221; 29 C.F.R. § 1607 et seq. (1974).

B. *High School Diploma Requirement.*

■ The parties disagreed on appeal as to whether there is a requirement that applicants for maintenance positions have a high school diploma. The district court can resolve this factual issue on remand. A high school diploma requirement is not *per se* illegal, but if plaintiffs can demonstrate that one exists and that it has disparate impact on the black class members, IP would then be required to justify it as a business necessity. *See* Griggs v. Duke Power Co., 401 U.S. at 431–433, 91 S.Ct. 849. The EEOC guidelines should once again provide the yardstick against which such validation should be measured. *See* United States v. Georgia Power Co., 474 F.2d at 918–919; 29 C.F.R. § 1607.2 (1974).

C. *Age Restrictions and Apprenticeship Periods.*

Unlike the testing requirements, the age restriction, also neutral on its face, is attacked by plaintiffs only as it "locksout" the victims of prior discrimination from the maintenance craft positions.

■ In the court's Pretrial Order of September 5, 1972, the parties stipulated that prior to September 1, 1962, all jobs, including maintenance positions, were segregated by race; therefore, no issue as to the existence of previous discrimination exists. The only question is whether the age requirement perpetuates that discrimination. It clearly does. Thus, it cannot be used as an obstacle to any discriminatee who desires to seek his rightful place in the maintenance department, unless the age requirement can be justified as a business necessity. *See Pettway,* 494 F.2d at 250. On remand, IP must demonstrate the business necessity of its age limitation or the district court should enjoin its use through the first transfer of any class member who desires to transfer and who is otherwise qualified.

Similarly, the length of each required apprenticeship should be scrutinized to insure that it does not unnecessarily slow the advancement of a prior discriminatee to his rightful place. The district court should insure that any needless impediment is removed for every class member.

## V. SUPERVISORY POSITIONS

Plaintiffs point to the nearly total exclusion of blacks in supervisory positions as demonstrating continued discrimination against blacks. IP does not question that blacks were previously excluded from supervisory positions, but challenges plaintiffs' proof that there is any present discrimination. On remand, the district court should examine all of the evidence on this issue to determine whether plaintiffs have proved a case of present discrimination in supervisory selection. *See* Hester v. Southern Railway Co., 497 F.2d 1374 (5th Cir. 1974). The selection process followed by IP provides a ready medium for racial discrimination and, accordingly, should be closely scrutinized. *See Pettway*, 494 F.2d at 240–243; Rogers v. International Paper Co., 510 F.2d at 1344–1347.

It is clear, on the other hand, that the present selection process could well perpetuate the discrimination previously practiced against the plaintiff class in this case, even if it is "neutral" as to present discrimination. The members of the plaintiff class were previously excluded from the lines of progression from which supervisors were and are selected. The Jackson Memorandum provided some opportunity for them to advance toward their rightful place, but we have previously noted its inadequacies. To the extent that the plaintiffs are ineligible for supervisory positions because they are not high enough in the lines of progression from which they were previously barred by discrimination, they are disadvantaged because of their employer's prior illegal practices.

■ Under such circumstances, IP must demonstrate that the requirement of being high in a line of progression is compelled by business necessity. If it cannot be so justified, it cannot be used to foreclose a class member's consideration for a supervisory position. As always, however, IP is not required to give a supervisory position to anyone who does not have the ability to do the job. *See Pettway*, 494 F.2d at 249.

## VI. BACK PAY AND ATTORNEY'S FEES

Concluding that IP's present system was free from the taint of discrimination, the district court refused to award back pay or attorney's fees. 352 F.Supp. 249–250. That decision must be reevaluated in light of this opinion, the result of further proceedings on remand and the significant recent decisions of this Circuit on the issue of back pay.

■ Recently, well after the district court's decision in this case, the Supreme Court issued an opinion defining the parameters of an appropriate back pay award in a Title VII action. Albemarle Paper Co. v. Moody, —— U.S. ——, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). That case and the recent cases from this Circuit discussing back pay provide the framework in which the district court should decide this case. *See, e. g.,* Baxter v. Savannah Sugar Refining Corp., 495 F.2d 437, 442–445 (5th Cir.), cert. denied, 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974); Franks v. Bowman Transportation Co., 495 F.2d at 421–422; *Pettway*, 494 F.2d at 251–253; Johnson v. Goodyear Tire & Rubber Co., 491 F.2d at 1374–1380. The district court will now have the opportunity to apply these newly illuminated principles, after having fully considered the various issues which we remand. *See* Duhon v. Goodyear Tire & Rubber Co., 494 F.2d 817, 819 (5th Cir. 1974). In the district court's opinion, care should be taken to explain fully the basis for any back pay decision so that it may be adequately reviewed by this Court if an appeal is taken.

## VII. CONCLUSION

■ In summation, we remand this case to the district court for reconsideration of whether any practices followed by IP are either presently discriminatory or, even though "neutral" on their face, presently perpetuate the disadvantaged position in which the ACs find themselves because of IP's prior discrimination.

The distinction between these two forms of present discriminatory effect is most important in fashioning an appropriate remedy. If the practice presently discriminates, it should be eliminated in its entirety. On the other hand, an otherwise neutral practice which perpetuates the effect of the employer's past discrimination need only be temporarily modified to provide those against whom it unfairly operates an opportunity to avoid that effect. Thus, a "neutral" seniority system should not be enjoined totally, but should be modified only as it applies to those employees who were previously subjected to discrimination, only to the extent necessary to remove the elements perpetuating that discrimination, and only for a limited period of time. Such a system should be allowed to apply unabated to all employees, black and white, against whom the employer did not discriminate. *See* Franks v. Bowman Transportation Co., 495 F.2d at 415–416.

The Court of Appeals for the Eighth Circuit has recently decided a case involving these same defendants, but different mill and plaintiff class. Rogers v. International Paper Co., 510 F.2d 1340 (8th Cir. 1975), petition for cert. filed, 43 U.S.L.W. 3666 (U.S. May 17, 1975) (No. 74–1446). The opinion in that case has been cited in some of the areas where applicable and where the law of the Eighth Circuit appears to be the same as this Circuit. The district court should be cautious, however, in placing reliance on that opinion, as the law of the Eighth Circuit significantly differs from that of this Circuit on some issues, for example, back pay entitlement. *Compare* Rogers v. International Paper Co., 510 F.2d at 1357 *with* Pettway v. American Cast Iron Pipe Co., 494 F.2d at 251–263.

Reversed in part, and vacated in part and remanded.