Louis ADAMS

v.

TEXAS & PACIFIC MOTOR
TRANSPORT COMPANY.

Civ. A. No. 72–207.

United States District Court,
E. D. Louisiana.

Sept. 10, 1975.

Thomas J. Divens, New Orleans, La., for plaintiff.

Rutledge C. Clement, Jr., Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for defendant Texas & Pacific Motor Transport Co.

John W. Ormond, New Orleans, La., for defendant International Brotherhood of Teamsters, Warehousemen & Chauffeurs, Local 270.

## MEMORANDUM OPINION

BOYLE, District Judge:

Plaintiff Louis Adams is a black man who sought employment as a truck driver with the defendant company on March 2, 1970. As part of the application procedure, he was required to complete an "employment registration card" and take the Wonderlic Personnel Test. Returning the next day, he was told he would not be hired because he had failed to achieve a required minimum score on the test. No other reason was given for the rejection of his application.

Adams now proceeds against both Texas & Pacific and Local 270 of the International Brotherhood of Teamsters, etc.[1] He alleges that the company's use of the Wonderlic test as a precondition of employment effectively discriminated against black applicants such as himself, and represented an employment practice violative of the Civil Rights Acts of 1964 (42 U.S.C. § 2000e *et seq.*) and of 1866 (42 U.S.C. § 1981). He seeks declaratory judgment that use of the test was illegal, an injunction against any such further discriminatory practices, and an award of back pay, "other compensation benefits,"[2] and "reasonable" attorney's fees.

We are constrained at the outset to declare moot plaintiff's claim for permanent injunctive relief. The uncontroverted testimony at trial by Angelo Petrillo, Texas & Pacific's Manager of Safety and Employee Relations, established that the company discontinued use of the test in August of 1971 because of the controversy surrounding it and the expense of validation if it were maintained. There is no indication that use of the test will be renewed. Hence, we proceed to the substantive question of

---

1. Adams originally brought this as a class action, but we denied his motion to maintain it as such. *See* Document # 54 in Record.

    The local, party to a collective bargaining agreement with the company, was given leave to intervene as a defendant in order to represent member employees whose seniority status might be affected if plaintiff were awarded relief. *See* Document # 46 in Record.

2. While not made expressly clear in the complaint, plaintiff's theory of back pay and compensatory relief apparently is premised upon his entitlement to instatement with the company as of March 3, 1970, should the failure to hire him on that day be declared illegal.

the defendant's liability within the framework of Adams' remaining claims for declaratory and compensatory relief.

■ As to plaintiff's Title VII cause of action, we restate the established rule that a complainant alleging racial discrimination under the statute carries the initial burden of proving a *prima facie* case. The Supreme Court has held that this may be done

> by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.[3]

We concern ourselves with the second of these criteria. It is not disputed that, at the time of his application, plaintiff had 12–13 years of truck-driving experience and a valid Louisiana chauffeur's license. However, Mr. Petrillo testified to additional requirements in terms of an applicant's personal and employment background; and the employment registration card,[4] which each applicant was asked to complete, suggests it was a matter of company policy to inquire into these areas at the very outset.[5]

In keeping with motor carrier safety regulations imposed by the United States Department of Transportation,[6] it was Texas & Pacific policy to avoid hiring drivers who were accident-prone or had unsafe driving records. Accordingly, one of the first inquiries on the registration card asks how many "chargeable acci-dents" the applicant has had in the previous three years.[7] To this question, plaintiff answered "None." Yet the evidence clearly shows that he was involved in *two* such accidents while employed by Herrin Transportation Company, and that both incidents (one in November, 1968, and the other in February, 1969) occurred well within the three years preceding Adams' application.[8] Cross-examined at trial, plaintiff simply replied that he omitted reference to the accidents because he did not remember them at the time of his application.

The short-form application card also inquired whether he had ever been convicted or arrested, to which Adams responded "Fight and Assault." Testifying in deposition and at trial, plaintiff elaborated by admitting to arrests and convictions for assaulting a policeman in 1960,[9] for driving without a license in 1965, for disturbing the peace in 1967, and for assaults in both 1968 and 1969.

Regarding his record of employment, plaintiff was required to list his four previous employers, the dates of employment with each, and the reasons for leaving. He listed: England Transportation, 8/69 to 11/69, "no work left extra man"; Strickland Transportation, 6/69 to 8/69, "no work left & extra man"; Red Ball, 5/69 to 6/69, "work got slack"; and West Bros., 8/62 to 11/68, no reason stated. Without holding a man with an eleventh grade education to strict standards of accuracy in such matters, we are compelled to note the discrepancies between this information and the facts on record.

To begin with the most glaring of these, plaintiff neglected to even men-

---

3. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). *Accord, Peters v. Jefferson Chemical Co.*, 516 F.2d 447, 449–50 (5 Cir. 1975).

4. *See* Defendant Exhibit No. D–2.

5. Petrillo testified that the card was employed as a screening device. Only after it was filled out for company scrutiny and the applicant passed the Wonderlic test, he stated, would a full-length application form be completed.

6. *See generally* 49 C.F.R. § 390.1 et seq. [Defendant Exhibit No. D–11].

7. These accidents would include those occurring in the scope of the applicant's previous employment which were chargeable to his negligence or carelessness.

8. *See* Defendant Exhibit Nos. D–7 and D–10.

9. Although at trial he denied having paid a fine for such an offense, plaintiff admitted in deposition that he had done so. *See* Deposition of Louis Adams in Record, at 61.

tion a 1968–1969 term of employment with Herrin Transportation Company. John Wagoner, a terminal manager at Herrin during the time, testified that Adams was released because of habitual absenteeism. As already noted, plaintiff also had two chargeable accidents while with Herrin. Further, although "no work" is given as the reason for leaving his most recent employer, England Transportation, it appears that plaintiff filed an EEOC grievance alleging a racially motivated discharge by that company. The Commission's decision letter rejects the charge, noting instead that "[t]he evidence of record does establish that Charging Party had a less than satisfactory production record . . ." with the company.[10] Finally, a complaint in section A of this court was filed on behalf of plaintiff on May 30, 1974, wherein it is alleged he was employed by Red Ball not from "5/69 to 6/69," but from February of 1968 to January of 1971, and that he was discharged "because of race" and not because work got slack.[11]

It is not necessary to hold as a matter of law that, on the basis of the foregoing, Texas & Pacific was bound to reject plaintiff's application. Nothing in the DOT safety regulations *requires* rejection of an application by one with Adams' driving record.[12] Nor is it the position of Texas & Pacific, expressed through Mr. Petrillo, that his driving record alone or his employment record alone or his convictions and arrests alone would have mandated rejection of Adams' application. We do find, however, that ample support exists in the record for Petrillo's testimony that Louis Ad-

ams—given the conglomerate of circumstances in his background—was not qualified to be a truck driver for the defendant company. His record of unsafe driving,[13] convictions and arrests, and his troubled relations with prior employers all would have contributed to, and justified, a decision that he was not fit for employment, aside from his performance on the Wonderlic test.

As has been mentioned, the short-form application form was a screening device. Had Adams answered its inquiries truthfully, we are convinced his application would have proceeded no further. Through material misrepresentations and omissions on the card, however, he was able to take the Wonderlic test, his score simply providing grounds for his inevitable rejection. Petrillo's testimony establishes that, even had he passed the test, Adams' hiring would have been on a probationary basis. Investigation by the company into his driving and employment record, as required by law,[14] quickly would have exposed the falsity of his application in these areas, and this alone probably would have led to his discharge. In any event, the disclosures also would have revealed what was true to begin with: that plaintiff lacked the necessary qualifications to serve in the position for which he had applied.

Admittedly, job qualification is but one of the four elements of a *prima facie* case under Title VII which the Supreme Court listed in *McDonnell,* supra; and the specifications were not announced as absolutes in every case, but as guidelines which would vary with each factual situation.[15] Nonetheless, we

**10.** *See* Defendant Exhibit No. D–3.

**11.** *See* Defendant Exhibit No. D–6. Adams also brought a charge before the NLRB challenging his release by Red Ball, but was unsuccessful in evidencing wrongful conduct by the union in its representative capacity. *See* Defendant Exhibit Nos. D–4 and D–5.

**12.** At the same time, the regulations expressly allow companies to impose more stringent requirements relating to the safe operation of their vehicles. *See* 49 C.F.R. § 392.1(b) [Def. Exh. No. D–11].

**13.** In addition to the chargeable accidents with Herrin and the arrest for driving without a license in 1965, the record also reveals that plaintiff had been charged with two red light violations and driving without a license plate. *See* Defendant Exhibit Nos. D–8 and D–9.

**14.** *See* 49 C.F.R. § 391.23 [Def.Exh. No. D–11].

**15.** *See* 93 S.Ct. at 1824 n. 13.

concur in our Circuit Court's recent observation that one's qualification for a position he has been denied is a "necessary element to a finding of job discrimination."[16] Accordingly, we find that plaintiff's lack of the necessary qualifications to drive a truck for Texas & Pacific—whether revealed to the company earlier or later than his Wonderlic test performance—is fatal to his Title VII cause of action. In so holding, we echo the language of the Supreme Court in its landmark decision which reprobated use of this same pre-employment test:

> Congress did not intend by Title VII . . . to guarantee a job to every person regardless of qualifications.[17]

■ Plaintiff also alleges a violation of his civil rights under section 1981 of the U.S.Code, Title 42.[18] Of course, his failure to establish an employment practice violative of Title VII does not foreclose a challenge that the same practice is racially discriminatory under section 1981.[19] Separate consideration of the claims is warranted even though they derive from an identical theory, i. e., that use of Wonderlic as a pre-employment test was discriminatory not by intention but in effect.

■ We recognize that, in Title VII litigation following the landmark opinion of *Griggs v. Duke Power Co.*, supra, such use of Wonderlic has been rejected.[20] In applying *Griggs* to the present case, however,[21] we also recognize the need for a twofold analysis. First, discriminatory impact *via* administration of the test must be not only alleged but evidenced. Only then is the employer expected to demonstrate that, despite its discriminatory effect, the test is job-related. In the case of *Griggs* itself, the Court proceeded on the basis of a record which

---

**16.** *Sabala v. Western Gillette, Inc.*, 516 F.2d 1251, 1264 (5 Cir. 1975).

**17.** *Griggs v. Duke Power Co.*, 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971).

**18.** By an amended answer prior to trial, Texas & Pacific raised the defense of prescription to plaintiff's 1981 claim. *See* Document # 67 in Record. Citing the Supreme Court's recent decision in *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), defendant argued that a state limitations period of one year barred the claim, since the failure to hire occurred in March of 1970 and Adams did not bring this action until January of 1972.

*Johnson* stands for the proposition that, when claims under 1981 and Title VII are brought together, a timely EEOC filing as to the latter will not toll the running of the state prescription period applicable to the former. A one year period accordingly was triggered in that case, inasmuch as Tennessee law imposed this limitation on actions "brought under the federal civil rights statutes . . . ." *See* 421 U.S. at 456, 95 S.Ct. at 1718 n. 2.

Applying *Johnson* to the facts at hand, we adhere to the Fifth Circuit's view that 1981 claims are governed by Louisiana's ten-year prescription period appropriate in contract actions. *See Boudreaux v. Baton Rouge Marine Contracting Co.*, 437 F.2d 1011, 1017 n. 16 (5 Cir. 1971). Thus, Adams' 1981 cause of action arising out of the defendant company's failure to hire him does not prescribe until March of 1980.

**19.** It now is settled that 1981 relief extends to private employer discrimination, and that the enactment of Title VII supplemented, rather than supplanted, this pre-existing remedy. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 1019–20, 39 L.Ed.2d 147 (1974); *Watkins v. United Steel Workers of Am., Local No. 2369*, 516 F.2d 41, 49 (5 Cir. 1975).

**20.** *See, e. g., Johnson v. Goodyear Tire & Rubber Co., Synthetic Rub. Pl.*, 491 F.2d 1364, 1372 (5 Cir. 1974).

**21.** Defendant argues that *Griggs* was announced subsequent to its use of Wonderlic to bar this plaintiff's employment, and that the current EEOC guidelines on employment testing procedures were not effective until August of 1970, some five months later in time. Nonetheless, the Supreme Court in *Griggs* merely interpreted and applied an already-existing provision in the 1964 Civil Rights Act. That provision allowed use of such tests as Wonderlic, if they were "not designed, intended or used to discriminate because of race . . . ." 42 U.S.C. § 2000e–2(h). The Court also relied on 1966 EEOC guidelines pertaining to the job-relatedness of tests. *See* 91 S.Ct. at 854 n. 9.

We have no doubt that the 1970 failure to hire plaintiff may be scrutinized in light of these contemporary sources of authority, as interpreted by the Supreme Court ruling.

showed that use of a battery of tests, including Wonderlic, had resulted in passing performance by 58% of whites taking them, but only 6% of the blacks.[22] Likewise, in Fifth Circuit decisions disallowing the use of Wonderlic, the evidence had established that a disproportionate number of blacks who took the test failed, as compared with their white counterparts.[23] Conversely, several cases in this circuit, applying the theory of *Griggs*, have either denied or delayed relief specifically on the grounds of plaintiff's failure to lay the logical groundwork of his claim by proving the discriminatory impact of a facially neutral employment scheme.[24]

■ Hence, that the Wonderlic test— as a matter of legal precedent—has not been shown to be job-related, would be a premature observation in this proceeding, plaintiff having failed to reach this stage of analysis under *Griggs*. He has produced no evidence whatsoever that Texas & Pacific's use of the test produced a disparate impact upon black, as opposed to white, job applicants.[25] To the extent his 1981 claim proceeds on the basis of *Griggs* and its progeny of case law, therefore, plaintiff's relief is foreclosed at the threshold in the absence of such proof.

■ Assuming *arguendo* that plaintiff had been able to evidence a racially discriminatory impact of the Wonderlic test in this case, we should note that his claim under 1981 still would fail under an alternative analysis. In *Cooper v. Allen*,[26] jurisdiction arose under 1981 to hear a black job applicant's claim that the use of a standardized test to bar his employment was illegal. The Fifth Circuit affirmed the district court's finding that the test disqualified a disproportionate number of blacks seeking employment and was not job-related, but nevertheless remanded the case in order to allow the employer an opportunity to prove "by clear and convincing evidence that, in light of the enumerated qualifications, [plaintiff] would not have been entitled to the job even had there been no requirement to take and pass the . . . test."[27] On remand, the lower court held that, as between the plaintiff and the white applicant who had been hired, the latter was better qualified regardless of test scores. The ruling was affirmed on appeal and the plaintiff's 1981 claim dismissed for failure to show discrimination because of race.[28]

Although Texas & Pacific did not go so far as to specifically demonstrate the hiring of a better qualified driver in place of Adams, we do not doubt that it could do so. Indeed, we feel safe in assuming that *whoever* was hired in the position for which plaintiff applied was better qualified in terms of personal and employment background. Any presumed racial discrimination effected by the initial use of Wonderlic would be removed altogether as a cause of plaintiff's rejection were use of the test obviated and his application reconsidered.[29] Whereas

---

**22.** *See* 91 S.Ct. at 853 n. 6.

**23.** See *Johnson v. Goodyear Tire & Rubber Co., Synthetic Rub. Pl.*, supra, at 1372 and n. 21; *United States v. Georgia Power Co.*, 474 F.2d 906, 912 n. 5 (5 Cir. 1973).

**24.** *See Stevenson v. International Paper Co., Mobile, Alabama*, 516 F.2d 103, 115–16 (5 Cir. 1975); *Robinson v. City of Dallas*, 514 F.2d 1271, 1272–73 (5 Cir. 1975); *Hester v. Southern Railway Co.*, 497 F.2d 1374, 1379–80 (5 Cir. 1974).

**25.** Plaintiff does allege that the position which he was denied was awarded to A. J. Ferry, a white applicant. Ignoring the testimony of Angelo Petrillo which tended to dispute the fact that Ferry was considered for a driver's job alongside Adams, we still do not regard this isolated instance as probative of the racially discriminatory effect of Wonderlic.

**26.** 467 F.2d 836 (5 Cir. 1972), *appeal on remand*, 493 F.2d 765 (5 Cir. 1974).

**27.** 467 F.2d at 840.

**28.** *See* 493 F.2d at 769 and n. 2.

**29.** This highlights the practical futility of plaintiff's claim, even had he proven racial discrimination *via* the Wonderlic test. The relief to which he would be entitled could not be reinstatement since he was not instated in the first place. Rather, he would be entitled to a reprocessing of his application without the administration of the test (which Texas & Pacific has abandoned anyway). Assuming he was truthful in completing the employment regis-

our earlier finding that plaintiff was unqualified defeated a *prima facie* showing under Title VII, therefore, the same finding would apply, under *Cooper*, to defeat his 1981 action. If the burden were shifted to it to justify the refusal to hire Adams separate and apart from his test performance, Texas & Pacific could do so by the testimony on record.

The foregoing reinforces by legal analysis a conclusion which we feel is compelled by the considerations of equity in this case. Civil rights legislation serves a broad remedial aim, but it clearly was not designed to assist job applicants found to have misrepresented themselves in seeking positions for which they are not qualified.

We accordingly hold that plaintiff's allegation of racial discrimination is without merit. Judgment shall be entered in favor of Texas & Pacific and Local 270, dismissing the complaint at plaintiff's cost.[30]

This opinion shall serve as the Court's findings of fact and conclusions of law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

tration card, however, he would be "screened out" no less routinely by his background than he was by his Wonderlic score. That result would be dictated by purely non-racial considerations, and we would be powerless to either question or change it.

**30.** Both defendants have stipulated to a waiver of their claims for reasonable attorney's fees. *See* Document # 73 in Record.